# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 24, 2012

No. 11-30387

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

BARBARA SUSAN CONEY, also known as Barbara Susan Chenoweth Coney,
Individually and in her capacity as Executrix of the Succession of Curtis John
Coney, Jr.,

Defendant-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before GARZA, DENNIS, and HIGGINSON, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The Government filed suit against Defendant-Appellant, Barbara Coney,
to reduce to judgment the tax liability owed by Barbara and her deceased
husband, Curtis, for the tax years 1996–2001. The district court granted
summary judgment in favor of the Government and rendered judgment in the
amount of $2,687,408.59. Barbara appeals, primarily claiming that the couple's
tax liability had been discharged in a prior bankruptcy proceeding. We
AFFIRM.

No. 11-30387

**I**

Curtis was the sole shareholder of CLS, Inc. ("CLS"), a law firm that primarily represented plaintiffs seeking to recover damages arising from automobile accidents. Because CLS was a Subchapter S corporation, Curtis and Barbara were required to report the firm's income on their joint income tax returns, regardless of whether that income was actually distributed to them during the tax year. *See Nail v. Martinez*, 391 F.3d 678, 683 (5th Cir. 2004); *Green v. Comm'r of Internal Revenue*, 963 F.2d 783, 786 (5th Cir. 1992).

The present action concerns the Coneys' joint income tax liabilities for the 1996–2001 tax years. The Coneys did not enter into an installment agreement with respect to those liabilities. The couple was required to make estimated tax payments for the relevant years, *see* 26 U.S.C. § 6654(d), but they did not make all or part of their estimated tax payments during any of those years. Further, although the Coneys did file a joint tax return for each of the relevant years, they did not pay the balance of their tax liability when filing their returns. Similarly, throughout the relevant tax years, Curtis consistently withheld insufficient amounts of tax from his income to meet his personal income tax liability. In total, the Coneys reported $7,503,795 of income on their joint returns for the tax years 1996 to 2001. Of this total, $1,418,584 was paid to Curtis in the form of wages; the remainder was income earned by CLS that was required to be included on the Coneys' personal returns. Because the Coneys failed to tender payment of the balance of their tax liability when filing their returns, the couple's returns declared that they owed at the time of filing a total of $1,619,951 to the Internal Revenue Service ("IRS") for the relevant years.

The IRS assessed the outstanding taxes reported on the Coneys' 1996–2001 returns, along with interest and penalties. Beginning in 1997, the IRS also began to file liens in the public record to secure the couple's tax liabilities. The Coneys retained an attorney to assist them with negotiating a

No. 11-30387

second installment agreement with the IRS.[1] As part of that representation, the Coneys' attorney provided the IRS with a list of CLS's pending cases and advised the agency that the couple would use the firm's fees from those cases to pay down the balance of the couple's 1994 and 1996 tax liabilities. However, subsequent bank records show that the couple did not use a $245,000 fee that the firm received from one of the listed cases in 2001 to pay down the couple's tax liabilities.

During the relevant tax years, CLS engaged in a high volume of cash transactions. Between 1998 and 2001, CLS employees made cash withdrawals totaling $2,116,929 from the firm's operating account, nearly 30% of the firm's gross receipts during the period. Throughout the relevant tax years, Curtis used some of this cash to pay illegal kickbacks to "runners" in exchange for client referrals. In an effort to conceal the illegal kickbacks from the Government, Curtis instructed CLS's staff from 1997 to 2001 to write checks to cash, either singly or in the aggregate, in amounts less than $10,000 per day. When a depositor withdraws more than $10,000 in currency during one business day, 31 U.S.C. § 5313(a) and its implementing regulations require financial institutions to file a report with the Commissioner of Internal Revenue. *See* 31 C.F.R. §§ 1010.306(a)(3), 1010.311, 1010.313. Structuring cash transactions to avoid the reporting requirements is a crime. 31 U.S.C. § 5324(a)(3), (d).

Eventually, a federal grand jury was empaneled to investigate possible criminal behavior on the part of various parties involved in the litigation of

---

[1] The Coneys, particularly Curtis, have a history of unpaid tax liabilities. From 1991 to 1995, the IRS filed three federal tax liens against Curtis—the 1995 lien was also filed against Barbara since the couple appeared to have married during the 1994 tax year—to secure significant outstanding tax liabilities for the tax years 1988, 1989, 1990, 1992, and 1994. In 1994, Curtis entered into an installment agreement with the IRS, in which he promised to pay $10,000 per month, plus 60% of his firm's case proceeds, minus expenses, until he paid off his liabilities for the tax years 1989, 1990, and 1993, which then totaled $655,468. The agreement also required Curtis to use the remaining 40% of the firm's case proceeds, minus expenses, to make estimated tax payments to the IRS for future tax years.

personal injury cases in Louisiana. Kathy Martino, a legal assistant employed by CLS, was subpoenaed to testify to the grand jury. Curtis had previously instructed Martino to write checks to cash on the firm's account in a manner that would avoid the federal currency transaction reporting requirements. After learning that Martino had been subpoenaed to testify, Curtis and Barbara asked Martino to meet with them at their home. At the meeting, which was recorded by Martino with the assistance of federal agents, both Curtis and Barbara "sought to influence Ms. Martino's grand jury testimony by urging her to testify falsely to the grand jury." In particular, both Coneys instructed Martino "to feign ignorance in response to any grand jury questions regarding the specific operations of [CLS], including using runners and paying them through structured transactions."

In October 2002, the grand jury returned an indictment charging Curtis with (a) one count of conspiracy to structure financial transactions in violation of 31 U.S.C. § 5324 from 1997 to 2001, (b) ten counts involving ten separate incidents of structuring financial transactions in violation of 31 U.S.C. § 5324 from 1997 to 2001, and (c) one count of obstruction of justice for attempting to influence Martino's grand jury testimony. The grand jury also returned an indictment charging Barbara with one count of obstruction of justice for attempting to influence Martino's grand jury testimony. In 2003, Curtis and Barbara pleaded guilty to all the counts charged against them. In the factual basis supporting their pleas, the couple admitted that Curtis had specifically instructed Martino "never to write checks to cash on the law firm's operating account amounting to more than $10,000 in one day so as not to trigger the statutory reporting requirements." The couple also admitted that Martino paid the runners at the direction and instructions of Curtis "and with the full knowledge of his wife, Barbara."

No. 11-30387

In April 2005, the IRS notified the Coneys of its intent to levy on the couple's assets to collect their outstanding liabilities for the tax years 1996–1998. A few months later, the Coneys filed a petition for Chapter 7 bankruptcy relief. The bankruptcy court eventually entered an order granting the Coneys a discharge of their debts under 11 U.S.C. § 727. The couple did not seek a determination of whether their tax liabilities were dischargeable, and the bankruptcy court closed the bankruptcy case.

After the bankruptcy court entered the discharge order, the Government filed the instant suit to reduce the Coneys' unpaid tax assessments to judgment. Curtis died while the case was pending in the district court, so the court substituted Barbara as a party in her capacity as executrix of Curtis's estate, in addition to her status as defendant in her individual capacity. The Government moved for summary judgment, contending that the Coneys' tax liabilities were excepted from the bankruptcy court's discharge order under 11 U.S.C. § 523(a)(1)(C). Section 523(a)(1)(C) provides that "[a] discharge under section 727 . . . of this title  does not discharge an individual debtor from any debt . . . for a tax . . . with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax." The Coneys opposed the motion, asserting that the taxes were not excepted from discharge under § 523(a)(1)(C).

The district court granted the Government's motion for summary judgment, holding that the Coneys' tax liabilities for the relevant tax years were not dischargeable. The district court concluded that the Coneys had willfully attempted to evade and defeat their tax debts by knowingly and intentionally (1) "structur[ing] the runner transactions to evade the [federal currency transaction reporting requirements], the natural and inescapable consequences of which was to conceal those substantial cash transactions from the IRS" and (2) "attempt[ing] to influence a grand jury witness to conceal the structuring scheme, which itself concealed the existence of the cash transactions from the

5

No. 11-30387

IRS." *United States v. Coney*, No. 08–1628, 2011 WL 1103631, at *6 (E.D. La. Mar. 22, 2011). After receiving proposed orders from the parties regarding the proper calculation of interest, the district court rendered judgment for the Government in the amount of $2,687,408.59, plus post-judgment interest. This appeal followed.

## II

On appeal, Barbara claims that the district court erred by concluding that she and Curtis willfully attempted in any manner to evade or defeat the payment of their taxes for the relevant years. She contends that the Government failed to establish that either of the Coneys (1) committed an affirmative act in violation of their duty to pay taxes or (2) willfully committed such an affirmative act. Alternatively, Barbara asserts that even if the Government met its burden as to Curtis under § 523(a)(1)(C), the Government did not establish that she willfully attempted to evade taxation. She also contends that even if the district court did not err in granting summary judgment for the Government, the court erred by awarding a money judgment in an improper amount.

We review a grant of summary judgment de novo, applying the same standard as the district court. *Harrigill v. United States*, 410 F.3d 786, 789 (5th Cir. 2005). "Summary judgment is proper when the record, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(c); *Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001)).

## A

"When a Chapter 7 debtor obtains bankruptcy relief, the general rule is that all debts arising prior to the filing of the bankruptcy petition will be discharged." *In re Bruner*, 55 F.3d 195, 197 (5th Cir. 1995) (citing 11 U.S.C. §

No. 11-30387

727(b)). However, to ensure that the Bankruptcy Code's "fresh start" policy is only available to "honest but unfortunate debtor[s]," Congress has provided that certain types of liabilities are excepted from the general rule of discharge. *In re Fretz*, 244 F.3d 1323, 1326–27 (11th Cir. 2001) (quoting *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)); *see also Bruner*, 55 F.3d at 197. We strictly construe exceptions to the general rule of discharge in favor of the debtor, *In re Cross*, 666 F.2d 873, 879–880 (5th Cir. 1982); *see also Fretz*, 244 F.3d at 1327 (collecting cases), and the party arguing against dischargeability bears the burden of proving the application of an exception by a preponderance of the evidence. *In re Grothues*, 226 F.3d 334, 337 (5th Cir. 2000).

11 U.S.C. § 523(a)(1)(C) is one such exception. It provides:

(a)   A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

(1)   for a tax . . .—

(C)   with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax[.]

11 U.S.C. § 523(a)(1)(C).

Section 523(a)(1)(C) creates two exceptions to discharge—when a debtor files a fraudulent return and when a debtor "willfully attempt[s] in any manner to evade or defeat [a] tax." The central issue in this appeal is whether the district court properly determined that both Coneys "willfully attempted" to evade or defeat their taxes for the relevant tax years.

Although we have not previously had to explicitly address the issue, we agree with our sister circuits that the plain language of the "willfully attempted" exception "contains a conduct requirement (that the debtor 'attempted in any manner to evade or defeat [a] tax'), and a mental state requirement (that the attempt was done 'willfully')." *Fretz*, 244 F.3d at 1327 (citing *In re Fegeley*, 118

No. 11-30387

F.3d 979, 983 (3d Cir. 1997)).  Because Barbara contends that the district court applied the wrong standard when deciding the dischargeability issue under both the conduct and the mental state prongs, we begin by determining the proper standard under each.

**1**

First, Barbara asserts that the district court misinterpreted our opinion in *Bruner* and applied the wrong standard when analyzing whether the Coneys' actions satisfied the conduct requirement of § 523(a)(1)(C).  She claims that the conduct prong required the Government to establish that the Coneys committed "affirmative acts in contravention of their duty to pay [their] taxes."  In short, Barbara asserts that because the Coneys filed accurate tax returns, attempted to pay their taxes to the best of their abilities, and did not conceal their income or assets, the couple did not engage in conduct that constituted an attempt to evade or defeat their taxes.

We disagree with Barbara's analysis of § 523(a)(1)(C)'s conduct requirement.  Her argument implicitly assumes that a willful attempt to evade or defeat taxes must consist of an attempt to evade the *assessment* of taxes rather than the *payment* or *collection* thereof.  Although we have not previously addressed the validity of her assumption, the bulk of federal authority considering the issue has held that § 523(a)(1)(C)'s conduct requirement applies equally to attempts to evade or defeat the collection and payment of a tax.  *See In re Griffith*,  206 F.3d 1389, 1395–96 (11th Cir. 2000) (en banc) (overturning *In re Haas*, 48 F.3d 1153 (11th Cir. 1995), in part, and holding that the conduct requirement of § 523(a)(1)(C) is satisfied where debtors engage in affirmative acts to avoid payment or collection of taxes); *Dalton v. I.R.S.*, 77 F.3d 1297, 1301 (10th Cir. 1996) (holding that conduct requirement includes attempts to conceal assets to avoid the payment or collection of taxes).  For the following reasons, we agree with the majority position.

No. 11-30387

We begin, as we must, with the plain language of § 523(a)(1)(C). *See Carder v. Cont'l Airlines, Inc.*, 636 F.3d 172, 175 (5th Cir. 2011). The statute excepts "such taxes" from discharge that the debtor "willfully attempted *in any manner* to evade or defeat." 11 U.S.C. § 523(a)(1)(C) (emphasis added). By using the unqualified phrase "*in any manner*" to modify a debtor's "willful attempts" to evade or defeat his taxes, the plain language of the statute suggests that "willful attempts" under § 523(a)(1)(C) include attempts to evade or defeat the payment or collection of a tax. *See Dalton*, 77 F.3d at 1301 ("[T]he modifying phrase 'in any manner' is sufficiently broad to include willful attempts to evade taxes by concealing assets to protect them from execution or attachment.") (quoting *In re Jones*, 116 B.R. 810, 814 (Bankr. D. Kan. 1990)). The plain language of the statute offers no reason to conclude that "willful attempts" only refer to attempts to evade the assessment of tax, but not the collection or payment thereof.

This broad reading of § 523(a)(1)(C) comports with the manner in which federal courts have interpreted similar language in the Internal Revenue Code. *See Spies v. United States*, 317 U.S. 492, 499 (1943) (interpreting the predecessor of 26 U.S.C. § 7201, which criminally sanctioned "[A]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof . . . ."); *id.* ("Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.'").[2]

---

[2] We acknowledge that unlike 26 U.S.C. § 7201 and similar tax provisions, 11 U.S.C. § 523(a)(1)(C) does not disjunctively refer to both attempts "to evade or defeat any tax *or the payment thereof.*" 26 U.S.C. § 7201 (emphasis added). The absence of such "payment thereof" language in § 523(a)(1)(C) originally persuaded the Eleventh Circuit in *Haas* to hold that the subsection did not apply to attempts to evade or defeat the collection or payment of taxes.

No. 11-30387

Further, the surrounding statutory language buttresses our interpretation of the conduct requirement because a contrary ruling would render the language creating the "willfully attempted" exception from discharge largely superfluous. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("[W]e follow 'the cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it.'") (citation omitted); *id.* ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation omitted).   In particular, other portions of § 523(a)(1) specifically except tax debts from discharge with respect to which the debtor did not file a required return, 11 U.S.C. § 523(a)(1)(B)(I), or "made a fraudulent return." *Id.* § 523(a)(1)(C).  Thus, if we were to interpret the conduct requirement to only apply to attempts to evade or defeat the assessment of tax, it is not clear what purpose the relevant language would serve; it is difficult to conceive how a debtor could willfully attempt to evade the assessment of a tax other than by failing to file or filing a fraudulent tax return. *Griffith*, 206 F.3d at 1395; *Dalton*, 77 F.3d at 1301.

Moreover, construing the conduct requirement in § 523(a)(1)(C) to apply to attempts to evade or defeat the payment or collection of taxes is supported by the "basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'" *See Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998)

---

*Griffith*, 206 F.3d at 1394.  However, as noted above, the Eleventh Circuit has overruled that holding.  *Id.* at 1395–96.  We likewise decline to follow *Haas* because limiting "willful attempts" under § 523(a)(1)(C) to attempts to evade the assessment of tax would render the subsection superfluous and undermine the statute's purpose of reserving discharge for honest but unfortunate debtors.  *See infra.*  Moreover, we have previously declined to interpret the Internal Revenue Code and Bankruptcy Code in the same manner when interpreting § 523(a)(1)(C), undermining any inferences that we could draw from the absence of "payment thereof" language in § 523(a)(1)(C).  *See Bruner*, 55 F.3d at 200 ("We are not convinced that the language of the Internal Revenue Code must be interpreted the same as that of the Bankruptcy Code. Both are very complex regulatory schemes with careful balances of different and competing policies.").

(describing policy of Bankruptcy Code) (citations omitted). "[A]ny statutory interpretation of 'evade or defeat' which relieves the dishonest debtor who conceals assets to avoid the payment or collection of taxes, but which penalizes the same dishonesty to avoid assessment, would be an absurd result." *Dalton*, 77 F.3d at 1301.

Lastly, our interpretation of the conduct requirement does not conflict with our prior holding in *Bruner*. Although in *Bruner* we distinguished the Bruners' actions from those of the debtor in *Haas* on the grounds that the Bruners "were involved in much more flagrant conduct aimed at avoiding even the *imposition* of a tax assessment against them," *Bruner*, 55 F.3d at 200, we did not hold that the conduct requirement only applied to attempts to evade the assessment of tax. Indeed, in *Bruner* we appeared to have determined that the Bruners' tax debts were ineligible for discharge, in part, because they had engaged in conduct that could be construed as attempts to avoid payment or collection of tax. *See id.* ("Moreover, they apparently conducted an inordinate number of cash transactions and even created a shell entity designed to conceal their income and assets.").

Accordingly, we hold that the conduct requirement of § 523(a)(1)(C) includes willful attempts to evade or defeat the payment or collection of taxes, in addition to their assessment.[3]

## 2

Second, Barbara asserts that the district court applied an improper standard when determining that the Coneys' actions satisfied § 523(a)(1)(C)'s mental state requirement—*i.e.*, that their attempts to evade or defeat their taxes

---

[3] As in *Bruner*, because we hold that both Coneys willfully engaged in affirmative acts to avoid collection and payment of their taxes, we need not determine whether (1) their actions amounted to "culpable omissions," *Bruner*, 55 F.3d at 200 (concluding that "[§] 523(a)(1)(C) surely encompasses both acts of commission as well as culpable omissions"), or (2) "mere non-payment" of tax is sufficient to preclude discharge. *Id.*

were done "willfully."  Barbara concedes that Curtis directed his employees to structure transactions to avoid federal currency reporting requirements and that they both attempted to interfere with the grand jury's investigation of Curtis's activities; however, she alleges that those actions did not satisfy § 523(a)(1)(C)'s mental state requirement because neither Coney took those actions with the specific intent to evade or defeat their taxes.  In short, she asserts that § 523(a)(1)(C)'s mental state prong requires that a debtor take an action with the specific intent to "thwart" the IRS's efforts to assess, collect, or secure payment of a debtor's taxes.

We disagree.  Our sister circuits have uniformly concluded that "a debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally," and have declined to require that a debtor engage in such an attempt with the specific intent to defraud the IRS.  *Fretz*, 244 F.3d at 1330 (citing *In re Tudisco*, 183 F.3d 133, 137 (2d Cir. 1999); *Fegeley*, 118 F.3d at 984; *In re Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996); *Dalton*, 77 F.3d at 1302; *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994)).  We implicitly adopted that position in *Bruner* by applying the three-part test for civil willfulness under the Internal Revenue Code to determine whether the debtors in that case "willfully attempted" to evade or defeat their taxes.  *See Bruner*, 55 F.3d at 197, n.4; *see also Fegeley*, 118 F.3d at 984 (declining to interpret the willfulness language in § 523(a)(1)(C) "consistently with the criminal provisions of the Internal Revenue Code," which require proof of fraud); *Toti*, 24 F.3d at 809 (holding "that the definition of 'willfully attempted to evade' was consistent with the definition found in other civil tax cases, which equates 'willful' with voluntary, conscious, and intentional evasions of tax liabilities") (citations omitted).

Accordingly, all the Government has to establish in order to satisfy § 523(a)(1)(C)'s mental state requirement is that the debtor (1) had a duty to pay

taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty. *Bruner*, 55 F.3d at 197; *Fretz*, 244 F.3d at 1330. To satisfy the third prong of this test, the Government need only establish that a debtor voluntarily and intentionally committed or attempted to commit an affirmative act or culpable omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the assessment, collection, or payment of a tax; the debtor need not have made their attempt with the specific intent to defraud the IRS. *See Fretz*, 244 F.3d at 1330 (holding that the willfulness language in § 523(a)(1)(C) does not require fraudulent intent) (citing *Fegeley*, 118 F.3d at 984); *Birkenstock*, 87 F.3d at 952 ("This willfulness requirement prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate.").

## B

### 1

Applying these standards to Curtis, we conclude that he willfully attempted to evade or defeat his tax liabilities for the 1996–2001 tax years under § 523(a)(1)(C).

First, given the context of Curtis's interactions with the IRS, we hold that his attempts to (1) structure cash transactions to avoid federal reporting requirements and (2) obstruct the Government's investigation of his activities satisfied § 523(a)(1)(C)'s conduct requirement.  Specifically, while the Coneys were incurring significant unpaid tax liabilities, attempting to negotiate payment plans with the IRS, and seeking to stave off collection proceedings by promoting the continued viability of Curtis's law firm to the IRS, Curtis was directing his employees to engage in a high volume of cash transactions and to illegally structure those transactions in a manner that would hide them from the Government.  Further, Curtis appeared to have ordered the bulk of these

transactions in order to acquire cash to illegally pay runners to generate cases for his firm—payments which Curtis contends he did not deduct from income on his tax returns as business expenses.

Under these circumstances, we agree with the district court that Curtis's efforts to circumvent the federal currency transaction reporting requirements defeated the IRS's ability to collect his tax liabilities and therefore constituted attempts to evade or defeat collection and payment of his taxes. As a general matter, the currency transaction reports provide the IRS with a valuable tool in pursuing the collection and payment of delinquent tax liability. The Bank Secrecy Act ("BSA") and its implementing regulations require financial institutions to send a report to the IRS when a depositor withdraws more than $10,000 in currency during one business day. *See* 31 U.S.C. § 5313(a); 31 C.F.R. §§ 1010.306(a)(3), 1010.311, 1010.313. Congress enacted the BSA, in part, because it was concerned with the problem of tax evasion. *Ca. Bankers Ass'n v. Schultz*, 416 U.S. 21, 27–29 (1974). Moreover, Congress has found and the Secretary of the Treasury has determined that currency transaction reports "have a high degree of usefulness in . . . tax . . . investigations or proceedings." 12 U.S.C. § 1829b; 31 C.F.R. § 1010.301.

Although not every attempt to avoid the currency transaction reporting requirements may constitute an attempt to evade or defeat a tax, we conclude that Curtis's structuring activities satisfied the conduct requirement. Specifically, given the high volume of cash transactions performed at Curtis's instructions, the illegal purpose for which Curtis used much of that cash, the Coneys' significant outstanding tax liability during the years in question, and the Coneys' attempt to forestall collection of their tax debts by highlighting the prospects of Curtis's law firm, the currency transaction reports would have been particularly relevant to the IRS in this case. If the IRS had received reports notifying it of the volume of cash withdrawals from CLS's operating account that

were not being deducted as business expenses, it is reasonable to conclude that the IRS would have investigated and instituted collection proceedings years earlier. At the very least, the broad scope and five-year duration of Curtis's structuring activities allowed him to shift significant assets out of the couple's possession in a manner that concealed the movement from the IRS and has prevented the agency from tracing how those assets were used, thereby further thwarting the agency's efforts to collect his tax liabilities. Similarly, Curtis's attempt to derail the grand jury investigation of his activities formed a further effort to conceal his structuring crimes and the underlying illegal runner payments; thus his obstruction of justice offense constituted an additional attempt to evade or defeat the payment or collection of his taxes.

Accordingly, we hold that Curtis's attempts to avoid the currency transaction reporting requirements and to obstruct the Government's investigation of his activities were affirmative acts to evade or defeat the collection and payment of his tax liabilities for the relevant tax years. *See Fretz*, 244 F.3d at 1329 ("The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes . . . .") (citation omitted).

We also conclude that Curtis engaged in his attempts to evade or defeat the collection or payment of his taxes with the requisite mental state under § 523(a)(1)(C)—willfully. To satisfy § 523(a)(1)(C)'s mental state requirement, the Government had to establish that Curtis (1) had a duty to pay taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty. *Bruner*, 55 F.3d at 197; *Fretz*, 244 F.3d at 1330. To satisfy the third prong of this test, a debtor need only voluntarily and intentionally commit or attempt to commit an affirmative act or culpable omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the assessment, collection, or payment of a tax; the debtor need not have made his

attempt with the specific intent to defraud the United States. *See Fretz*, 244 F.3d at 1330.

Here, Curtis indisputably had a duty to pay the relevant taxes. It is also undisputed that he demonstrated his knowledge of that duty by filing tax returns for the relevant tax years that expressly acknowledged his outstanding tax liabilities. Further, Curtis pleaded guilty in criminal proceedings to committing the acts which we have determined satisfied § 523(a)(1)(C)'s conduct requirement, and he specifically acknowledged in the factual basis supporting his plea that he (a) structured transactions during the relevant tax years to avoid the federal reporting requirements and (b) attempted to interfere with the grand jury's investigation of his activities. Thus, he necessarily admitted to voluntarily and intentionally committing the affirmative acts that we have concluded were attempts to evade or defeat the collection and payment of his tax liabilities for the relevant years. *See Wolfson v. Baker*, 623 F.2d 1074, 1077–78 (5th Cir. 1980) (holding that in both civil and criminal cases collateral estoppel "bars relitigation of an issue actually and necessarily decided in a prior action"). It does not matter if he did not commit those acts with the specific intent to defeat the collection of his taxes. *See Fretz*, 244 F.3d at 1330.

### 2

For similar reasons, we conclude that Barbara willfully attempted to evade or defeat her tax liabilities for the 1996–2001 tax years under § 523(a)(1)(C).

First, under the totality of the circumstances, Barbara's attempt to interfere with the Government's investigation of Curtis's activities satisfied § 523(a)(1)(C)'s conduct requirement. In the factual basis supporting her guilty plea to obstruction of justice, Barbara admitted that (1) Martino paid the runners at the direction and instructions of Curtis "and with [Barbara's] full knowledge" and that (2) "on numerous occasions [both Coneys] instructed Ms. Martino to feign ignorance in response to any grand jury questions regarding the

specific operations of [CLS], including using runners and paying them through structured transactions." Accordingly, when Barbara attempted to influence Martino's grand jury testimony, Barbara necessarily knew that Martino was structuring the firm's cash withdrawals at Curtis's direction in a manner that would avoid the currency transaction reporting requirements. *See Wolfson*, 623 F.2d at 1077–78 (describing operation of collateral estoppel).

As stated previously, Curtis's efforts to avoid the currency transaction reporting requirements constituted an attempt to evade or defeat the collection and payment of his taxes. Barbara sought to further conceal Curtis's activities from the Government by attempting to persuade Martino to lie to the grand jury regarding the runner payments and the structuring efforts undertaken to avoid detection of those payments. As we held regarding Curtis's obstruction of justice offense, Barbara's effort to influence Martino's testimony likewise was an attempt to evade or defeat the payment or collection of her taxes under these circumstances—*i.e.*, because the currency transaction reporting requirements would have greatly assisted the IRS with collecting the Coneys' tax liabilities. Thus, Barbara's efforts to persuade Martino to testify falsely to the grand jury constituted an affirmative act to defeat the collection and payment of her taxes, thereby satisfying § 523(a)(1)(C)'s conduct requirement. *See Fretz*, 244 F.3d at 1329 ("The conduct requirement is satisfied, however, where a debtor engages in affirmative acts to avoid payment or collection of taxes . . . .") (citation omitted).

Second, Barbara's attempt to evade or defeat her taxes for the relevant years satisfied all three prongs of § 523(a)(1)(C)'s mental state requirement. *Bruner*, 55 F.3d at 197. It is undisputed that Barbara had a duty to pay the relevant taxes. However, Barbara contends that even though she signed the couple's joint tax returns for the relevant years, she did not know she had a duty

to pay those taxes because she was not involved in the couple's finances and Curtis had told her that he had paid the couple's tax liabilities. We disagree.

In certain cases, a taxpayer may be unaware of his duty to pay taxes, despite the fact that he filed a tax return during the relevant tax year. For instance, in *Birkenstock*, the Seventh Circuit held that a wife lacked knowledge of her duty to pay certain taxes—even though she had signed joint tax returns for the years in question—because she had no reason to believe that her husband had improperly imputed certain income to a family trust. *Birkenstock*, 87 F.3d at 953. Here, however, the Coneys' tax returns expressly indicated the couple's outstanding tax liabilities. Thus, Barbara's signature on the returns confirms her knowledge of her duty to pay the relevant taxes.

Nevertheless, Barbara maintains that Curtis told her that he had subsequently paid some of the couple's outstanding taxes for the relevant years, thereby negating her knowledge of her duty to pay the relevant taxes. We find this argument unpersuasive. At her deposition, Barbara admitted that by 1999, she knew that the IRS was attempting to collect the couple's outstanding tax liabilities. Thus, when she attempted to influence Martino's grand jury testimony in 2002, Barbara had knowledge of her outstanding tax liabilities and her corresponding duty to pay those liabilities.

Lastly, we conclude that Barbara's actions satisfied the third prong of § 523(a)(1)(C)'s mental state requirement—*i.e.*, she voluntarily and intentionally violated her duty to pay her taxes. *Bruner*, 55 F.3d at 197; *Fretz*, 244 F.3d at 1330. Barbara pleaded guilty to a count of obstruction of justice based on her attempt to interfere with Martino's testimony and admitted that she committed that offense with "full knowledge" of Curtis's activities. Thus, Barbara necessarily attempted to influence Martino's grand jury testimony voluntarily and intentionally. Because we have concluded that Barbara's obstruction of justice offense was an attempt to evade or defeat the collection and payment of

No. 11-30387

her tax liabilities for the relevant tax years, Barbara voluntarily and intentionally violated her duty to pay her taxes. It does not matter if she did not make her attempt to evade or defeat her taxes with the specific intent to defeat the collection of her taxes. *Fretz*, 244 F. 3d at 1330.[4]

Accordingly, we conclude that the district court did not err when it concluded that the Coneys' tax liabilities for the tax years 1996–2001 were excepted from the bankruptcy court's discharge order under 11 U.S.C. § 523(a)(1)(C).

## C

Alternatively, Barbara contends that the district court erred in awarding the Government a money judgment. She further claims that even if a money judgment was proper, the court awarded judgment in an improper amount. Because her challenges to the district court's judgment and its calculation of interest turn on questions of law, we review them de novo. *See Trans-Serve, Inc. v. United States*, 521 F.3d 462, 468 (5th Cir. 2008).

Barbara's arguments are unpersuasive. First, she offers no support for her argument that the district court should have refrained from awarding a money judgment. Regardless, the district court had the authority to award a money judgment. *See* 26 U.S.C. § 7402.

---

[4] Barbara also appears to contend that neither she nor Curtis could have willfully attempted to evade or defeat their taxes because they lacked the ability to pay their tax liabilities. She asserts that the district court erroneously found that the couple could have used the money they illegally paid to runners to satisfy the entirety of their tax liabilities. But whether a debtor had the ability to pay his taxes is only one "appropriate factor" we employ when deciding whether a debtor "willfully attempted" to evade or defeat their taxes. *In re Grothues*, 226 F.3d 334, 339 (5th Cir. 2000) ("As to the lack of a finding that the Grothues had the ability to pay the taxes, the key § 523(a)(1)(C) determination is whether debtor's conduct is *willful*. Whether debtor has the ability to pay is, of course, an appropriate factor in making that determination, but it is *not* a litmus test."). Here, given the Coneys' substantial income during the relevant tax years and the reasons stated above, we conclude that both Coneys willfully attempted to evade or defeat their taxes, even if the Government did not establish as a matter of law that the couple could have paid every cent of their tax liabilities if they had chosen to.

19

Second, Barbara alternatively makes two challenges to the amount of the district court's judgment. On the one hand, by contending that a proper judgment would have been in the amount of $1,311,729—the amount of the couple's unpaid tax liability exclusive of interest or any penalties—Barbara implicitly argues that the judgment should not have assessed any interest on her outstanding tax liabilities. However, the Internal Revenue Code clearly requires Barbara to pay interest on her unpaid tax liabilities for the period from the date they were due to the date of payment. *See* 26 U.S.C. § 6601(a); 28 U.S.C. § 1961(c)(1).

On the other hand, Barbara contends that even if the district court could have awarded interest on the couple's unpaid tax liabilities, the district court improperly calculated that interest. She asserts that the district court erroneously combined the couple's tax liabilities for six different tax years into one sum. She argues that tax liabilities from different years should not be lumped into one sum because interest would accrue upon interest and "interest accrues at different rates on the liabilities over the different years." Barbara's arguments are misguided. The Internal Revenue Code provides that post-judgment interest is compounded daily; hence, there is no prohibition on "interest accruing upon interest." 26 U.S.C. § 6622. Moreover, combining the couple's tax liabilities from different years into one judgment does not have any effect on the calculation of interest. While it is true that the underpayment interest rate changes over time, the Government adjusts that rate quarterly and the underpayment rate is therefore the same for any given quarter regardless of when the underpayment occurred. *Id.* § 6621(a)(2), (b).

The Government provided the district court with detailed interest calculations, and Barbara has not pointed to any evidence that calls its calculations into question. Accordingly, we conclude that the district court did

No. 11-30387

not err in awarding judgment for the Government in the amount of $2,687,408.59.

## D

Barbara also claims that the district court abused its discretion by denying two motions she filed in the lower court to strike three statements in the Government's summary judgment filings. Two of the statements alleged that CLS filed fraudulent tax returns for the relevant tax years, and the other alleged that the Coneys' tax attorneys assisted the couple in filing false and inaccurate returns. Barbara contends that the district court should have stricken the disputed statements because of their scandalous and prejudicial nature and because they impermissibly expanded the pleadings by advancing a new allegation of fraud.

We review a district court's ruling on a motion to strike for abuse of discretion. *Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 178 (5th Cir. 2007).[5] Federal Rule of Civil Procedure 12(f) provides that a district court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." The district court denied Barbara's motions to strike as moot, determining that the disputed pleadings were "unrelated to the undisputed facts that support[ed]" its order granting summary judgment for the Government. *Coney*, 2011 WL 1103631, at \*2, n.5. But even though the disputed pleadings were not related to the grounds upon which the district court granted summary judgment, they were not immaterial or impertinent to the controversy itself. *See Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962) (holding "that the action of striking a

---

[5] We assume without deciding that Barbara could file a motion to strike the Government's summary judgment filings pursuant to Rule 12(f). *Cf.* 5C Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 1380 & n.8.5 (3d ed. 2012) ("Rule 12(f) motions only may be directed towards pleadings as defined by Rule 7(a); thus motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f).")

pleading should be sparingly used by the courts" and that "motion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy") (quoting *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)).  Here, the disputed statements were material and pertinent to the underlying controversy because filing a fraudulent tax return is an alternative basis for nondischargeability under 11 U.S.C. § 523(a)(1)(C).

Similarly, we reject Barbara's contention that the disputed pleadings were "scandalous." Although the disputed pleadings might "offend[] the sensibilities" of Barbara and her attorneys, those pleadings are not scandalous because they are directly relevant to the controversy at issue and are minimally supported in the record.  *See In re Gitto Global Corp.*, 422 F.3d 1, 12 (1st Cir. 2005) (holding that a pleading is not "scandalous" under Rule 12(f) merely because "the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action[;] [a]s a result, courts have permitted allegations to remain in the pleadings when they supported and were relevant to a claim for punitive damages") (quoting *Hope ex rel. Clark v. Pearson*, 38 B.R. 423, 424–25 (Bankr. M.D. Ga. 1984)).  Thus, the district court did not abuse its discretion by denying Barbara's two motions to strike statements contained in the Government's summary judgment filings.

## III

For the foregoing reasons, we AFFIRM the judgment of the district court.