**IN RE: Richard E. BARTO and Stacy L. Barto, Debtors.**

**Richard E. Barto and Stacy L. Barto, Plaintiffs,**

**v.**

**United States of America Department of Treasury Internal Revenue Service, Defendant.**

**CASE NUMBER: 15–65320–MGD ADVERSARY PROCEEDING NUMBER: 15–05369– MGD**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

12/16/2016

Edward F. Danowitz, Danowitz Legal, P.C., Atlanta, GA, for Plaintiffs.

Joseph R. Ganahl, U.S. Department of Justice, Tax Division, Civil Trial Section, Southern Region, Washington, DC, for Defendant.

## ORDER

A trial on Debtors' Complaint against the Internal Revenue Service ("IRS") to determine the dischargeability of certain tax debts was held on September 20, 2016. Edward Danowitz appeared on behalf of the Debtors and Joseph Ganahl appeared on behalf of the IRS. In their complaint, Debtors asserted that the debts owed for the taxable years 2004–2007 are dischargeable. (Doc. 1). In response, the IRS claimed that the tax debts for the years in question are excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(C). (Doc. 6). For the reasons set forth below, the Court finds that the debts owed for the taxable years 2004–2007 are excepted from discharge. This Order memorializes the Court's decision and constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052(a). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and venue is proper. The Bankruptcy Court has authority to enter a final determination in this matter.

## I. FINDINGS OF FACT

Between 2004 and 2007, Mr. Barto owned and operated a corporation, Apex Marketing Solutions ("Apex"), which was in the business of magazine sales. (Tr. at 9, lines 8–15). Mrs. Barto testified that she helped out at Apex, entering orders and getting the leads ready. (Tr. At 142, line 23–142, line 6). Corporate employees made telephone sales of magazine subscriptions. (Tr. at 15, lines 11–15). The subscriptions were generally for a five year period and

cost between $600 and $800. (Tr. at 19, lines 8–11).

Apex received funds from an entity referred to as Periodic Publishers Service Bureau ("PPSB") based upon the revenue anticipated from the payment of the subscriptions. (Tr. at 141, lines 26–28). Funds received were based upon a percentage of sales.[1] The PPSB funds went into the Apex's bank account and were used to pay for the operations of the business. Employees were paid through a payroll service and income and payroll taxes were withheld from their compensation and remitted to the appropriate governmental entities. (Tr. at 14, lines 9–20). The Bartos were not on Apex's payroll but they took withdrawals from the corporate bank account to pay their personal expenses. (Tr. at 21, lines 10–13; 22 at lines 14–23; 142 at lines 7–9). No taxes were withheld from the sums paid to them. (Tr. at 20, lines 2–4). No estimated tax payments were made on the withdrawals. Mr. Barto testified that the loans from PPBS were repaid as Apex customers made payments on their subscriptions. (Tr. at 18, lines 20–22).

Mr. and Mrs. Barto withdrew substantial sums from the Apex account and many of these transactions were cash withdrawals. These distributions totaled $78,357 for 2004, $108,868 for 2005, $126,775 for 2006, $180,959 for 2007, $137,750.97 for 2008, $94,932.46 for 2009, and $17,841 for 2010. (Exh. D–38).[2] Apex did not file corporate

tax returns and the Bartos did not file personal tax returns. Mr. Barto testified that he had paid taxes prior to 2004 but did not remember whether returns were filed in specific years, and Mrs. Barto testified that she paid taxes in 2004. (Tr. at 23, lines 17–25; 142, lines 12–14). In 2004, Mr. Barto did not make any computations as to the company's income and expenses or otherwise consider whether tax returns must be filed. (Tr. at 23, lines 7–16). At trial, he repeatedly insisted that the money he received was a loan and therefore not taxable income. (*Id.* at lines 12–16; 24 at lines 19–23; 134 at lines 7–8).[3]

During the time period that the Bartos were not filing tax returns or paying taxes, Mr. Barto expended funds for travel for business and family, gambling and pool tournaments, in addition to regular living expenses. (Tr. at 25, lines 25–33). The Bartos also entered into two separate real estate transactions that were described as "contract for deed" or "rent to own". (Exh. D–42; Tr. at 37, line 7–12; 82–85). These were essentially transactions in which title to the real estate would not pass to the Bartos until the purchase price was paid in full. (Exh. D–42). Neither transaction was completed to the point where the Bartos obtained title to the property though they did expend funds to upgrade at least one of the properties. (Exh. D–34 at 146, 153; Tr. At 42, lines 6–22). Thus, they were able to avoid having property titled in their

1. No loan documents were offered into evidence at trial so the exact terms of the relationship between Apex and PPSB is unknown. The bank account statements were entered into evidence, but there does not appear to be any record in those statements indicating repayments for any loans, although Mr. Barto testified that repayments were made (Tr. at 103, line 25–104, lines 1–10). It also does not appear that payments from customers were deposited into the Apex account to any substantial degree.

2. I is undisputed that Apex Marketing Solutions, Inc. was dissolved under the laws of Illinois in December of 2009 (Doc. 20 at 16, ¶ 17).

3. Plaintiffs' Exhibit 12 reflects that the Bartos raised the issue of loans with the IRS and the IRS agreed to reduce the gross income by the loan amounts the Bartos substantiated. But this subtraction did not lower the final adjusted gross because of underreporting of income in other areas. (*See* Exh. P–12)

name and thus subject to levy. Mr. Barto also acquired a Jaguar automobile, using his father's credit and making the payments to his father. (Tr. at 49, lines 6–11; 53, lines 1–8; 55, lines 7–12). This is another instance of enjoying the benefits of ownership of property without taking title.

In 2008, Mr. Barto was contacted by taxing authorities from the State of Illinois and that prompted him to hire an accountant to prepare tax returns for the years 2004–2007. (Tr. at 56, lines 14–19). The Bartos provided documents to the accountant and the joint returns were prepared in September 2008 and filed in October and November 2008. (Exhs. D–6–D–9; Tr. at 58–59; 65 at lines 18–25). These returns reflected taxable income and are inconsistent with the Bartos' position at trial that all funds they received from Apex were borrowed funds. These returns were admitted into evidence as Defendant's Exhibits 11–14. Mr. Barto did not recall reviewing the returns with the accountant and was unable to recall if they were filed, although the parties stipulated that they were. (Doc. 20 at 14, ¶ 1–3; Tr. at 63–65). The filed returns reflected taxes owing as follows: $22,380 for 2004; $47,189 for 2005; $22,665 for 2006; and $34,824 for 2007. (Exhs. D–11–D–14). The Bartos made no payments for these taxes. (Doc. 20 at 15, ¶ 8). The 2004 and 2005 taxes were assessed on February 9, 2009; the 2006 taxes were assessed on December 22, 2008; and the 2007 taxes were assessed on November 10, 2008. (Exhs D–6–D–9). A tax lien was filed on July 10, 2009 and a Notice of Intent to Levy was issued on July 20, 2009. (*Id.*).

In response to these collection efforts by the IRS, in August 2009, Mr. Barto provided a revenue agent with information to complete a Collection Information Statement, (Exh. D–19), although he does not specifically recall doing so. (Tr. at 67, lines 18–23). Mr. Barto testified that he discussed with the IRS that he believed the liabilities were wrong and that the liens and levies the IRS had filed were improper. (Tr. at 68, lines 21–25; 69, line 1). He testified that although he and his wife were given the opportunity to provide documentation to the IRS to substantiate his contentions, they did not do so. (Tr. at 69, lines 2–12). The IRS also gave the Bartos the opportunity to prepare and file their 2008 return so that losses from that year could be carried back. (Tr. At 69, lines 5–12). They did not do so. (*Id.*). In June of 2010, the Bartos received a determination from the IRS that the taxes were due and that the liens and levies were proper. (Exh. D–20).

The Bartos then filed a petition in Tax Court in July 2010. (Exh. P–14). A decision upholding the liabilities was entered in June 2012 and the Bartos stipulated to the entry of the decision. (Exh. D–22). Mr. Barto testified that he agreed to the judgment and never sought to withdraw that agreement. (Tr. at 72, lines 1–8). The 2008 return for the Bartos was prepared by an accountant in September 2012. (Exh. P–7). The Bartos also prepared, without the assistance of any tax preparer, amended returns for 2004–2007. (Exhs. D–15–D–18). These were filed in November 2013. (*Id.*; Exhs D–6–D–9). The Bartos engaged the services of a tax attorney to assist with the review of the returns by the IRS. (Exh. P–15). The returns for 2006 and 2007 were examined and it was determined that there was insufficient documentation to reduce the amount of taxes reflected on the original returns. (Tr. at 149–150). Since the statute had passed for both years, additional taxes which would have been due as a result of the documentation provided by the Bartos were not assessed. (Tr. at 150, lines 3–10). The bank records provided to the IRS by the Bartos reflected greater amounts of gross income than reflected on

the original or amended returns and there was insufficient documentation for substantial expenses shown on the amended return. (Exh. D–23 at 2). Mr. and Mrs. Barto were advised of this result in May 2015. (Exh. D–23)

The Bartos filed a chapter 7 bankruptcy case on August 12, 2015. (Bankr. Doc. 1). The complaint to determine the dischargeability of the taxes was filed on September 21, 2015. (Doc. 1).

Mr. Barto has limited education. His highest level of education was through eleventh grade. (Tr. at 73, line 25–74, line 1). He first got involved in the magazine sales business at the age of 18 or 19 and had been in the business for approximately seventeen years in 2004, the first year for which tax liability is at issue. (Tr. at 75, lines 18–22). He incorporated Apex without any assistance from legal counsel. (Tr. at 76, lines 15–18). Mr. Barto testified that he believed that the funds which he withdrew from Apex were not income to him because they were from loans from PPSB for which he was personally liable. Despite his professed lack of sophistication in business affairs, he knew that receipt of loan proceeds would not constitute income. He indicated that he knew it was a loan because he had to repay the funds and a judgment was entered against him for $382,000.[4] He also indicated that repayments were made, although no specific amount was stated.

## II. CONCLUSIONS OF LAW

### A. Section 523(a)(1)(C) Generally

■ Because the taxes in question were due more than three years prior to the petition date and were assessed more than 240 days prior to the petition date, the debt would otherwise be dischargeable in Debtors' chapter 7 bankruptcy. *See* 11 U.S.C. §§ 523(a)(1), 507(a)(8). The parties stipulated to this fact at trial, leaving as the only remaining question whether the tax debt is excepted from discharge pursuant to § 523(a)(1)(C). (Tr. at 6, line 19–7, line 5).

■ Section 523 provides that;

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title [11 USCS § 727, 1141, 1228(a), 1228(b), or 1328(b) ] does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

(A) of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title [11 USCS § 507(a)(2) or 507(a)(8) ], whether or not a claim for such tax was filed or allowed;

(B) with respect to which a return, or equivalent report or notice, if required—

(i) was not filed or given; or

(ii) was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or

(C) with respect to which the debtor made a fraudulent return **or willfully attempted in any manner to evade or defeat such tax** . . .

11 U.S.C. § 523(a) (emphasis added). "Exceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor." *United States v. Fretz (In re Fretz)*, 244 F.3d 1323 1327 (11th Cir. 2001). Thus, the burden of

---

4. (Tr. at 78). In the Bartos' bankruptcy schedules, the claim of PPSB is scheduled as unsecured in an unknown amount. There is no mention in the Statement of Financial Affairs of any litigation which would have resulted in a judgment or a judgment lien.

proof is on the IRS to establish the exception to the general rule.

## B. Willful Evasion Under § 523(a)(1)(C)

■ "A finding of 'willfulness' requires only a showing that the debtor took such actions willingly, not that he took such actions with an intent to defraud the United States." *Hamm v. United States (In re Hamm)*, 356 B.R. 263, 284 (Bankr. S.D. Fla. 2006) (citing *Fretz*, 244 F.3d at 1330). The Eleventh Circuit utilizes a two-prong test to determine "whether a debtor has willfully evaded his taxes pursuant to § 523(a)(1)(C), which require[s] proof by the Government that the debtor engaged in (1) evasive conduct with (2) a mental state consistent with willfulness. *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1327 (11th Cir. 2011).

### i. Evasive Conduct

■ The evasive conduct requirement is satisfied with proof "the debtor engaged in affirmative acts to avoid payment or collection of taxes, either through commission or culpable omission." *Id.* at 1327 (quoting *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 921 (11th Cir. 2007)). Though mere nonpayment is not enough to satisfy the conduct requirement, "nonpayment in conjunction with a failure to file tax returns has been deemed to constitute evasive conduct." *Id.* (citing *Fretz*, 244 F.3d at 1329). In *Mitchell*, the court found that the conduct prong was satisfied where the debtor failed to file tax returns for the years 1998 through 2002 until June of 2003 and failed to pay the taxes owed for those years. *Id.* Similarly, in this case it is undisputed that the Bartos failed to file returns for the years 2004–2007 until November 2008 and that no payments were made for those taxes. The Court therefore finds that the conduct prong has been met and turns now to whether the IRS established willfulness.

### ii. Willfulness

■ "A debtor acts willfully when the debtor's attempt to avoid tax liability is 'done voluntarily, consciously or knowingly, and intentionally.'" *Mitchell*, 633 F.3d at 1327 (citing *Jacobs*, 490 F.3d at 924). Thus, in the Eleventh Circuit, tax debts are non-dischargeable "if the debtor acted knowingly and deliberately in his efforts to evade his tax liabilities." (*Id.*). "[A] debtor's attempt to avoid his tax liability is considered willful under § 523(a)(1)(C) if it is done voluntarily, consciously or knowingly, and intentionally." *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1330 (11th Cir. 2001). "The required mental state is shown when the Government proves that the debtor: (1) had a duty under the law, (2) knew he had the duty, and (3) voluntarily and intentionally violated the duty." *Mitchell*, 633 F.3d at 1327.

### 1. Known Duty Under the Law

The first and second prongs of the willfulness requirement are established by the fact that the joint filings were actually made, albeit late, and that those filings reflected liability. The Bartos contended at trial that no tax was due because the withdrawals from Apex were loans. But they failed to assert this argument when the taxes were originally filed, and the substantiation provided to the IRS in connection with a review of the return showed only $30,000 of loans. (Exh. P–12). Further, the Bartos stipulated to the tax court judgment, showing liability. Thus, their argument at trial that the balance of the withdrawals were loans and not taxable income is barred by res judicata. The Court therefore finds that the IRS met its burden in establishing that the Bartos had a duty under the law and knew about that

duty and now turns to the third prong: voluntary and intentional violation of that duty.

### 2. Voluntary and Intentional Violation of that Duty

 Because direct evidence is rarely available to prove the intent of the debtor, courts considering whether a debtor acted voluntarily and intentionally rely on certain types of conduct—sometimes referred to as "badges of fraud"—that provide indicia of "willful evasion." These badges of fraud may include:

> (i) the understatement of income for more than one tax year; (ii) implausible or inconsistent behavior; (iii) the debtor's failure to cooperate with the IRS; (iv) inadequate record keeping; (v) transfers of assets for inadequate consideration; (vi) transfers that greatly reduce assets subject to IRS execution and (vii) any other conduct that is likely to mislead or conceal."

*Peterson v. United States (In re Peterson)*, 317 B.R. 556, 563–64 (Bankr. N.D. Ga. 2004).

The Court finds that several badges of fraud are present in this case, indicating voluntary and intentional action. First, the audit review indicated both that the income shown on the returns as filed was understated and that certain deductions were in excess of those allowed.[5] Next, the Debtors failed to cooperate with the IRS as evidenced by their failure to cooperate with the IRC in the collection proceeding and tax court case. Specifically, the Bartos failed to provide the documentation requested by IRS agents. This failure, along with Mr. Bartos' testimony indicating that he believed he and the corporation were

the same, also indicate inadequate record keeping. Last, the Court finds there was conduct likely to mislead or conceal. First, the Bartos transacted business using substantial amounts of cash for no apparent reason. Next, the Bartos used Apex funds to pay personal expenses, and by 2009 they had closed their personal bank account and were using a different corporate account as a personal account. Last, the Bartos availed themselves of IRS procedural vehicles that resulted in a suspension of collection activities for a significant portion of the time between assessment and the bankruptcy filing.

Finally, Mr. Barto was not a credible witness. He failed to recall much of anything when questioned by the IRS, but was able to recall specific details such as the amount of the judgment against him when questioned by his own counsel. And, though he professed to not know much about incorporation or how tax returns worked, he repeatedly testified that he knew that loans did not constitute income for tax purposes.

### C. Mrs. Barto

 At trial, counsel for Plaintiffs argued that the IRS had failed to meet its burden with respect to Mrs. Barto. (Tr. at 199, line 24–200, line 7). The Court invited post-trial briefing on the issue, and the IRS submitted its post-trial brief on October 4, 2016. (Doc. 27). Plaintiffs did not submit a post-trial brief. The Court finds that Defendant has met its burden with respect to Mrs. Barto as well. First, as stated above, the conduct prong is met by Plaintiffs' failure to file tax returns for the years 2004–2007 until late 2008, combined

---

**5.** (Exh. D–23). Specifically, the report and the testimony of the agent who prepared the report indicated that a deduction had been taken for mortgage interest payments on the 2006 and 2007 returns, but there was no documentation indicating mortgage interest had actually been paid or that the Bartos owned a home during the years in question. (Exh. D–23 at 14, Tr. at 150, line18–151, line 14).

with their failure to pay taxes for those years. The tax returns that were filed are joint tax returns, and both .Plaintiffs signed the 2006 tax return. (Exh. P–13).

Next, with respect to the willfulness prong, the joint returns for the years in question expressly indicate the Bartos' outstanding tax liabilities, thus Mrs. Barto's signature on the 2006 return confirms her knowledge of her duty to pay the relevant taxes, as does the Bartos' stipulation to the tax court judgment. *See United States v. Coney*, 689 F.3d 365 (5th Cir. 2012) (Debtor wife's signature on joint tax returns indicating liability confirmed her knowledge of her duty to pay the relevant taxes in question). Last, the Court's findings with respect to the badges of fraud listed above apply with equal force to Mrs. Barto: income was underreported on the Bartos joint tax returns; the Bartos both failed to cooperate with the IRC in both the collection proceeding and the tax court case by failing to provide documentation requested by IRS agents; Mrs. Barto testified that she accepted money from Apex and used those funds to pay personal expenses (Tr. at 143–146); and the Bartos both availed themselves of IRS procedural vehicles that resulted in a suspension of collection activities. Accordingly, the Court finds that Defendant met its burden under § 523(a)(1)(C) with respect to Mrs. Barto.

### III. CONCLUSION

For the reasons set forth above, the Court finds that the tax debt owed for the years 2004–2007 in the amount of $123,958[6] should be excepted from discharge pursuant to § 523(a)(1)(C). The Bartos engaged in willfully evasive conduct to avoid paying their taxes for those years. Accordingly,

It is **ORDERED** that the tax debt owed for the year 2004–2007 in the amount of $123,958 is excepted from discharge pursuant to § 523(a)(1)(C).

---

6. This amount was calculated based on the assessed amounts in the stipulated facts. (Doc. 20 at 14, ¶ 3).