[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-10596

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 24, 2011
JOHN LEY
CLERK

D.C. Docket No. 4:09-cv-00079-CDL,
BKCY No. 06-40631-BKC-JTL

IN RE: LARRY C. MITCHELL,

Debtor,

_____

UNITED STATES OF AMERICA,

Defendant – Appellant

versus

LARRY C. MITCHELL,
a.k.a. Larry Carl Hazen Mitchell,

Plaintiff – Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(February 24, 2011)

Before WILSON and PRYOR, Circuit Judges, and BUCKLEW,[1] District Judge.

BUCKLEW, District Judge:

The United States appeals from the district court's decision affirming an order of the bankruptcy court, in which the bankruptcy court determined that Larry C. Mitchell's ("Mitchell") federal income tax debt was dischargeable in bankruptcy.[2] Because we conclude that the bankruptcy court clearly erred in its finding that Mitchell had not willfully attempted to evade or defeat his taxes within the meaning of 11 U.S.C. § 523(a)(1)(C), we REVERSE the decision of the district court.

## I.    Background

### A.    Procedural History

Mitchell filed Chapter 11 bankruptcy on August 29, 2006, which was converted to a Chapter 7 petition on October 3, 2007. On March 19, 2008, Mitchell filed an amended complaint to determine the dischargeability of his past

---

[1]Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

[2]The district court inadvertently referred to the United States as plaintiff and Larry C. Mitchell as defendant in the style of its opinion. However, Mitchell is the plaintiff in this case as he initiated the proceedings in the bankruptcy court to determine the dischargeability of his past due taxes.

due income taxes for the years 1998 to 2002.[3]  The Government contended that the

taxes were not dischargeable under 11 U.S.C. § 523(a)(1)(C).  That statute

prohibits discharge of taxes with respect to which a debtor willfully attempted in

any manner to evade or defeat such tax.  *See* 11 U.S.C. § 523(a)(1)(C).

In February and March of 2009, the bankruptcy court held a trial on the

issue of dischargeability and found that Mitchell's failure to pay his taxes was not

willful for three reasons: (1) there was insufficient circumstantial evidence to

support a finding of willfulness using the traditional badges of fraud analysis;[4] (2)

Mitchell's discretionary expenditures were not lavish or extravagant enough to be

---

[3]Mitchell's past due income taxes for 1998 to 2002 totaled approximately $286,000 representing personal income taxes, interest, and penalties.

[4]In the case of *In re Peterson*, 317 B.R. 556 (Bankr. N.D. Ga. 2004), a bankruptcy court set forth the badges of fraud analysis and its reason for using such analysis in cases involving the willfulness component of § 523(a)(1)(C):

> In cases of this nature, direct evidence is rarely available to prove the intent of a debtor.  Therefore, courts rely on certain types of conduct sometimes called "badges of fraud" that provide an indicia of a "willful" evasion by the debtor to defeat or evade his or her tax liability.  This conduct may include (i) the understatement of income for more than one tax year; (ii) implausible or inconsistent behavior; (iii) the debtor's failure to cooperate with the IRS; (iv) inadequate record keeping; (v) transfers of assets for inadequate consideration; (vi) transfers that greatly reduce assets subject to IRS execution and (vii) any other conduct that is likely to mislead or conceal.  Not one of these factors is determinative since the court considers the totality of the circumstances in each individual case.  However, the presence of multiple factors gives rise to a rebuttable presumption of willful evasion.

*Id*. at 563-64 (citations omitted).

considered evidence of willful tax evasion; and (3) the various forces impacting Mitchell's financial situation excused his nonpayment of his federal taxes. The bankruptcy court found Mitchell's taxes to be dischargeable in bankruptcy by reasoning that "[a]lthough, Debtor's failure to file tax returns or pay his taxes satisfies the conduct requirement, the case lacks the type of fraudulent behaviors – such as hidden assets or extravagant spending – that would support a finding of willfulness." (R.1:34).

The Government appealed the bankruptcy court's decision to the district court. The district court affirmed the bankruptcy court, holding that the bankruptcy court had not committed clear error in finding that Mitchell did not willfully evade paying his taxes within the meaning of § 523(a)(1)(C). However, the district court noted that "[w]hether [Mitchell] satisfied § 523(a)(1)(C)'s mental state requirement by 'willfully' engaging in the conduct is a closer call, one that this [c]ourt finds the bankruptcy court could have resolved either way." (R.5:1117). The district court stated that it was "not authorized to second-guess the factual findings of the bankruptcy court unless they are clearly erroneous." (R.5:1118). The Government appealed the district court's decision to this Court.

B.    Factual Background

1.    **Mitchell's Employment and Earnings**

4

Since 1986, Mitchell has been a successful real estate agent in Columbus, Georgia, affiliated as a sales associate with Coldwell Banker, Kennon, Parker, Duncan and Key Realtors ("Kennon Parker"). Between 1986 and early 2006, Mitchell was self-employed and worked for Kennon Parker as an independent contractor. Due to Mitchell's status as an independent contractor, Kennon Parker did not withhold payroll taxes from his commission checks, and Mitchell was responsible for remitting his outstanding federal income and employment taxes to the Internal Revenue Service ("IRS"). Until 1998, Mitchell paid all federal taxes owed; however, on multiple occasions he fell behind in payments, which resulted in levy threats and repayment plans with the IRS.

Starting in 1998, Mitchell simply stopped filing tax returns and stopped paying his federal income taxes. Mitchell maintained this pattern of non-compliance for five years, until June 2003, when he filed late returns for 1998 through 2002. At the time Mitchell filed these late tax returns, he did not make any payments toward his past due taxes for 1998 through 2002. At trial, Mitchell testified that he did not pay his taxes from 1998 to 2002 because his living, business, and divorce expenses fully exhausted his income.

Mitchell earned an annual adjusted gross income[5] of over $100,000 from 1998 to 2002, with the exception of 2000 when he earned approximately $88,000. When asked at trial why he had not paid anything towards his past due taxes even though in 2001 he earned over $170,000,[6] Mitchell responded: "[i]t doesn't take a rocket scientist to figure out that I'm going to owe somewhere around [$]300,000 plus interest and penalties. So at that point, I haven't filed anything. I don't have [$]300,000. I don't want to open this up yet." (R.3:678). Additionally, from 2003 to 2006, despite consistently earning an annual adjusted gross income over $175,000, Mitchell did not pay any amount towards his past due taxes for 1998 to 2002, with the exception of payments made in July and August of 2006 under his installment agreement with the IRS.

### 2. 1998 to 2002: Events Surrounding Mitchell's Tax Delinquency

Mitchell and his first wife separated in 1998 and eventually divorced in November 1999. The divorce decree required Mitchell to pay his ex-wife monthly alimony and child support, a lump sum payment of $10,000, six percent of his adjusted gross income over $75,000, as well as her attorney's fees. In December

---

[5]Mitchell's adjusted gross income reflects his income after deductions for business expenses and alimony.

[6]In 2001, Mitchell had a gross income of $176,128 and an adjusted gross income of $132,741.

1999, Mitchell married his current wife, Kathleen Mitchell ("Kathleen"), and began supporting Kathleen, Kathleen's two children from previous marriages, and Kathleen and Mitchell's new baby.

From 1999 to 2002, Mitchell and his family lived in a rental house and Mitchell paid rent of $1,200 per month. Then, in 2002, despite owing four years of past due taxes to the IRS, amounting to approximately $164,000, Mitchell and Kathleen bought a house on Pintail Drive ("Pintail House") for $200,000 from Mitchell's friend, Tommy Sorrell. The Pintail House was purchased solely in Kathleen's name, and she obtained 100% financing for the purchase from Mr. Sorrell, who knew Kathleen was not working and that Mitchell would be making the mortgage payments. Mitchell paid the monthly mortgage of $1,537 as well as the insurance and utilities. At trial, counsel for the Government asked Mitchell why the Pintail House was purchased solely in Kathleen's name:

> Mitchell: I had tax problems. I hadn't paid my taxes and I knew I had these problems and I didn't want to jeopardize the house with Tommy Sorrell who was a personal friend. So I said, "[w]ould you finance it for my wife?" I'm not going to deny that. I mean, that's, kind of, a no-brainer here. I mean, obviously, that's why it was in her name.

> Counsel: And why would that jeopardize Mr. Sorrell?

> Mitchell: Because he owned the property free and clear and if I moved into that and bought that house and he financed it with me and

7

if the IRS were to puts liens on it and levies and everything, it could affect the equity in his home.

(R.3:680).

### 3.    Mitchell's Negotiations with the IRS

In June of 2003, Mitchell hired an attorney and submitted tax returns for all years at issue in this case.  Based on those tax returns, Mitchell's adjusted gross income and federal income tax for the relevant years were as follows:

|       | Adjusted Gross Income | Tax Owed  |
|-------|-----------------------|-----------|
| 1998  | $164,782              | $56,947   |
| 1999  | $103,136              | $35,887   |
| 2000  | $88,586               | $28,428   |
| 2001  | $132,741              | $43,058   |
| 2002  | $128,561              | $40,727   |
| **Total** | **$617,806**      | **$205,047** |

Upon the late filing of his tax returns, the IRS sent Mitchell a final demand for payment.  Rather than paying any of his delinquent taxes, Mitchell submitted an offer in compromise to the IRS, offering $25,000 for over $200,000 in past due taxes.  A pending offer in compromise halts any collection activity by the IRS, and Mitchell understood this.  This first offer was returned due to certain deficiencies in Mitchell's employment tax returns.  Mitchell submitted a second offer in compromise for $25,000 in January of 2004, which was returned because Mitchell

8

had not made any of his 2003 estimated tax payments.

Finally, in April 2004, Mitchell submitted a third offer for $35,000. In November 2004, the IRS sent Mitchell a letter indicating that it had completed a preliminary analysis of his third offer in compromise and determined that Mitchell was capable of fully paying his outstanding tax debts. In response, Mitchell's attorney sent a letter on November 12, 2004 to the IRS, which warned:

> [I]n determining what is in the best interest of the IRS, the Service should look at reasonable collection potential . . . due to the fact that the taxpayer could file bankruptcy against all of the non-payroll taxes except 2002 and 2003 (and could do so against 2002 in April, 2006, and against 2003 in April, 2007).[7]

(Govt. Exh. 21 Tab M at LMUSA 0418).

In June 2005, the IRS officially returned Mitchell's third offer in compromise, because Mitchell had fallen behind on his 2004 estimated tax payments. The IRS informed Mitchell that it had determined he could pay his past due taxes in full and that he could not submit another offer in compromise for six months. Also in June of 2005, the IRS issued a notice of intent to levy against all of Mitchell's assets and income.

In August 2005, after receiving the notice of intent to levy, Mitchell formed MI Real Estate Network Incorporated ("MI Real Estate"). Mitchell's wife,

---

[7]The taxes Mitchell owes to the IRS for 1998 to 2002 are non-payroll taxes.

Kathleen, was made the sole officer, director, and shareholder of MI Real Estate.

When asked why Kathleen was made the sole officer, director, and shareholder,

Mitchell testified:

> We received the garnishment [notice of intent to levy] shortly before and the garnishment clearly stated that they could get all my income. I hadn't worked out a compromise and under advice of . . . accountants and attorneys, their advice was if you want to continue selling real estate, continue operating as a realtor continuing to make money to support your family . . . then you're going to at this point need to consider going ahead and forming a corporation so that the IRS, who will not compromise with you, does not come in and just shut you down. Plus, it will be a way that you could structure paying your taxes so that you don't wait at the end of the year to pay a lump sum that sometimes you have it and sometimes you don't.

(R.3:701).

Also in 2005, although Mitchell had not resolved his tax delinquencies for 1998 to 2002, he and Kathleen started building a larger house on Leafbrook Drive ("Leafbrook House") and agreed to pay $465,000 for construction. In December 2005, Mitchell and Kathleen sold the Pintail House, realizing a profit of approximately $56,000. Kathleen deposited the proceeds into the bank account she used as a Mary Kay beauty consultant, and she eventually used $46,000 of the proceeds as a down payment on the Leafbrook House. Kathleen obtained a stated income loan for the Leafbrook House, and the house was titled solely in her name. As with the Pintail House, Mitchell made all the mortgage payments

10

(approximately $3,300 per month), insurance payments, and utility payments for the Leafbrook House. When asked why the Leafbrook House was purchased solely in Kathleen's name, Mitchell testified that it was because he was unable to obtain a loan.

In February 2006, the IRS issued levies on Mitchell's income from Kennon Parker and on Mitchell's personal bank account at Wachovia Bank. At this time, Mitchell closed his personal bank account at Wachovia and began depositing his commission checks into Kathleen's Mary Kay account and into the MI Real Estate account, even though MI Real Estate was not yet operational.[8]

On February 16, 2006, Mitchell proposed to the IRS an installment agreement to pay his past due taxes. A pending installment agreement stops any other collection activity by the IRS and requires full repayment of taxes. Mitchell proposed to timely make his estimated tax payments and to pay nine percent, eventually increasing to twelve percent, of his gross revenues to the IRS. The IRS accepted Mitchell's proposed installment agreement, and Mitchell made payments pursuant to the agreement in July and August of 2006. On August 29, 2006, Mitchell filed his bankruptcy petition.

---

[8]Kennon Parker determined that the levy issued on Mitchell's commissions was a one time levy, rather than a continuing levy, and so Kennon Parker made only one payment to the IRS on February 8, 2006.

In addition to the expenditures described above, Mitchell also made discretionary expenditures from 1998 to present, rather than paying his past due taxes. Those discretionary expenditures included: (1) repaying a personal loan of approximately $30,000; (2) purchasing stock in Compaq and Intel; (3) from 2002 to 2006, contributing $100 per month to an investment account; (4) from 2002 to 2005, purchasing three vacation timeshares, which included almost $4,000 in down payments and monthly payments ranging between $100 and $250; and (5) donating approximately $81,000 to his church.

## II.    Discussion

"As the second court of review of a bankruptcy court's judgment, this Court examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court." *In re Jacobs*, 490 F.3d 913, 921 (11th Cir. 2007) (quoting *In re Issac Leaseco, Inc.*, 389 F.3d 1205, 1209 (11th Cir. 2004) (internal quotation marks omitted). "We review the bankruptcy court's factual findings under the clearly erroneous standard." *In re Fretz*, 244 F.3d 1323, 1326 (11th Cir. 2001) (citing *Gen. Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1494 (11th Cir. 1997)). The relevant issue in this case – whether or not Mitchell willfully attempted to evade or defeat his federal income taxes – is a question of fact reviewable for clear error. *Jacobs*,

490 F.3d at 921. However, conclusions of law, whether from the bankruptcy court or the district court, we review *de novo*. *Fretz*, 244 F.3d at 1326.

A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition. *See* 11 U.S.C. § 727(b). However, "this 'fresh start' policy is only available to the 'honest but unfortunate debtor.'" *Fretz*, 244 F.3d at 1326 (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 659 (1991)). To ensure that only the honest but unfortunate debtors receive the benefit of discharge, Congress enacted several exceptions to § 727(b)'s general rule of discharge. The exception at issue in this case is contained in 11 U.S.C. § 523(a)(1)(C), which provides, in relevant part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
>
> (1) for a tax or a customs duty –
>
> . . . .
>
> (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax.

11 U.S.C. § 523(a)(1)(C).

Mitchell did not file a fraudulent return in this case, so we only look to the second part of § 523(a)(1)(C) – whether Mitchell willfully attempted in any manner to evade or defeat such tax – to determine the dischargeability of his past

13

due taxes for 1998 to 2002. "The Government bears the burden to prove, by a preponderance of the evidence, that a particular claim is nondischargeable under § 523(a)." *In re Griffith*, 206 F.3d 1389, 1396 (11th Cir. 2000) (en banc) (citing *Grogan*, 498 U.S. at 287-88, 111 S. Ct. at 659-60). Furthermore, exceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor. *Fretz*, 244 F.3d at 1327. This Court has set forth a two-prong test for determining whether a debtor has willfully evaded his taxes pursuant to § 523(a)(1)(C), which requires proof by the Government that the debtor engaged in (1) evasive conduct with (2) a mental state consistent with willfulness. *See Jacobs*, 490 F.3d at 921; *Fretz*, 244 F.3d at 1327. We will address each of these requirements in turn.

A.    The Conduct Requirement

"The government satisfies the conduct requirement when it proves the debtor engaged in affirmative acts to avoid payment or collection of taxes, either through commission or culpable omission." *Jacobs*, 490 F.3d at 921 (citations and quotation marks omitted); *see also Fretz*, 244 F.3d at 1329; *Griffith*, 206 F.3d at 1395-96. Accordingly, this Court has held that mere non-payment of taxes is insufficient to satisfy the conduct requirement; however, nonpayment in conjunction with a failure to file tax returns has been deemed to constitute evasive

14

conduct. *See Fretz*, 244 F.3d at 1329-30; *see also In re Birkenstock*, 87 F.3d 947, 951-52 (7th Cir. 1996).

In the instant case, it is undisputed that Mitchell failed to timely file tax returns for 1998 through 2002 as he did not file tax returns for those years until June 2003, and he failed to pay the federal taxes he owed for those years. Therefore, this Court concludes that the record supports the findings of the bankruptcy and district courts that Mitchell's failure to file tax returns and failure to pay taxes for 1998 to 2002 was sufficient to satisfy the conduct requirement of § 523(a)(1)(C).

B.    The Mental State Requirement

Because the conduct requirement has been satisfied, the outcome of this case hinges on whether the Government proved by a preponderance of the evidence that Mitchell willfully attempted to evade or defeat his taxes as required by § 523(a)(1)(C). A debtor acts willfully when the debtor's attempt to avoid tax liability is "'done voluntarily, consciously or knowingly, and intentionally.'" *Jacobs*, 490 F.3d at 921 (quoting *Fretz*, 244 F.3d at 1330). The required mental state is shown when the Government proves that the debtor: (1) had a duty under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated the duty. *Jacobs*, 490 F.3d at 921 (quoting *Griffith*, 206 F.3d at 1396); *see also In*

*re Gardner*, 360 F.3d 551, 558 (6th Cir. 2004).

During the trial before the bankruptcy court, Mitchell admitted he had a duty to pay income taxes and that he knew of the duty. Therefore, the only issue for this Court to decide is whether Mitchell voluntarily and intentionally violated his duty to pay his income taxes. In *Fretz*, we held that "[t]he third or willfulness component of the mental state requirement 'prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate.'" *Fretz*, 244 F.3d at 1330 (quoting *Birkenstock*, 87 F.3d at 952). However, in *Jacobs*, we clarified that "[a]lthough this Court did suggest in *Fretz* that 'inadvertent mistakes' are insufficient to trigger § 523(a)(1)(C)'s exception to dischargeability, it also made clear that the necessary trigger is knowledge and deliberateness." *Jacobs*, 490 F.3d at 924. Accordingly, the established rule in this Circuit is that a debtor's tax debts are non-dischargeable if the debtor acted knowingly and deliberately in his efforts to evade his tax liabilities. *Id.*

After a three day trial, the bankruptcy court found insufficient evidence to support a conclusion of willfulness as required by § 523(a)(1)(C). Specifically, the bankruptcy court found "the case lacks the type of fraudulent behaviors – such as hidden assets or extravagant spending – that would support a finding of

16

willfulness." (R.1:34). However, we have held that fraudulent intent is not required, *see Fretz*, 244 F.3d at 1330, and that all the Government must prove is that Mitchell acted knowingly and deliberately. *See id.*; *Jacobs*, 490 F.3d at 924. The record contains overwhelming evidence of Mitchell's willful intent to evade his taxes, and the bankruptcy court clearly erred when it concluded there was insufficient evidence to support a conclusion of willfulness.

First, Mitchell testified at trial that he did not file tax returns for 1998 to 2002 until June of 2003 because he knew if he did, the IRS would try to collect the full amount that he owed. When asked why he had not paid anything towards his past due taxes even though in 2001 he earned over $170,000, Mitchell responded: "[i]t doesn't take a rocket scientist to figure out that I'm going to owe somewhere around [$]300,000 plus interest and penalties. So at that point, I haven't filed anything. I don't have [$]300,000. I don't want to open this up yet." (R.3:678).

Second, in 2002, despite owing four years of past due taxes to the IRS, Mitchell and Kathleen bought the Pintail House from Mitchell's friend for $200,000, but they purchased the house solely in Kathleen's name even though Kathleen had no income and Mitchell paid the mortgage, insurance, and utilities. When asked why they chose to purchase the house solely in Kathleen's name when Mitchell made all of the house payments, Mitchell told the bankruptcy court

17

that he knew he had tax problems with the IRS and did not want to jeopardize the house. Mitchell testified that he understood the IRS could put liens and levies on the house and that it was a "no-brainer" to put the house in his wife's name. (R.3:680). In 2005, although Mitchell still owed five years of past due taxes, he and Kathleen sold the Pintail House and agreed to pay $465,000 for the construction of a larger house (Leafbrook House). Again the house was titled solely in Kathleen's name despite the fact that Mitchell paid the mortgage, insurance, and utilities.

Third, in November of 2004 while the third offer in compromise was pending, Mitchell's attorney sent a letter to the IRS warning that Mitchell "could file bankruptcy against all of the non-payroll taxes except 2002 and 2003 (and could so against 2002 in April, 2006, and against 2003 in April, 2007)." (Govt. Exh. 21 Tab M at LMUSA 0418). In other words, if the IRS refused to accept Mitchell's third offer in compromise of $35,000 for over $200,000 in tax debts, Mitchell would file bankruptcy and discharge his tax debts. Although the bankruptcy court had this letter in its possession, it apparently overlooked the paragraph in which Mitchell's attorney made this threat, and therefore it did not

18

consider the letter as evidence of Mitchell's willfulness.[9]

Fourth, in August 2005, after receiving the IRS's intent to levy, Mitchell testified that he formed MI Real Estate and made his wife the sole officer, director, and shareholder so the IRS could not "shut [him] down." (R.3:701). He testified that he formed MI Real Estate after he had received the IRS's garnishment [notice of intent to levy], because he had not yet worked out a compromise with the IRS and he wanted to continue selling real estate and supporting his family. In February 2006, when the IRS issued levies on Mitchell's income and on his personal bank account, Mitchell closed his bank account and began depositing his commission checks into the MI Real Estate account and Kathleen's Mary Kay account. It is clear that Mitchell understood that when his Kennon Parker commissions were deposited into his MI Real Estate account, the IRS could not touch them.

Mitchell's testimony provided direct evidence of his willfulness within the

---

[9]In a footnote to its order declaring Mitchell's taxes dischargeable, the bankruptcy court said that it was unable to locate the letter threatening bankruptcy to the IRS, and therefore, it did not consider the letter. The bankruptcy court stated that the only November 2004 letter found in evidence addressed to the IRS was one "requesting reconsideration of the third offer in compromise, providing detailed rebuttals of income and expense figures used by the IRS in considering the offer, slightly increasing the amount offered to $38,000, and reserving the right to appeal any negative result." (R.1:16 n.2). This letter described by the bankruptcy court is in fact the same letter that contains Mitchell's threat of bankruptcy. (Govt. Exh. 21 Tab M at LMUSA 0418).

meaning of § 523(a)(1)(C). Mitchell testified that he did not file tax returns because he did not want the IRS to start collection activity; that he purchased the Pintail House in his wife's name because he knew the IRS could levy his own assets; and that he formed MI Real Estate so he could continue selling real estate without the IRS garnishing his commissions. Additionally, his lawyer sent a letter to the IRS threatening bankruptcy, and ostensibly a discharge of his entire tax debt, if the IRS did not accept his offer in compromise. This direct evidence along with the circumstantial evidence of Mitchell titling homes in his wife's name and closing his personal bank account and depositing his commission checks into the MI Real Estate account or his wife's Mary Kay account when faced with the prospect of an IRS levy, provide clear evidence of Mitchell's willful attempt to evade payment of his taxes. That willful intent is further shown by Mitchell's discretionary spending, which included purchasing vacation timeshares, purchasing stock, repaying a $30,000 personal loan, and donating approximately $81,000 to his church. Moreover, the record contains no evidence that Mitchell's failure to pay his taxes was the result of inadvertence or mistake. *See Fretz*, 244 F.3d at 1331 ("There is no evidence that Dr. Fretz' failure to file returns and pay taxes during these years was due to inadvertence or mistake; indeed, his own testimony rules out that possibility.").

20

In *Fretz* and again in *Jacobs*, we held that the willfulness component of the mental state requirement of § 523(a)(1)(C) is satisfied if the government shows that a debtor's "'efforts to evade tax liability are knowing and deliberate.'" *Fretz*, 244 F.3d at 1330 (quoting *Birkenstock*, 87 F.3d at 952); *see also Jacobs*, 490 F.3d at 924. Mitchell's actions and testimony show that his failure to file returns or pay his taxes was based on knowing and deliberate decisions to evade or defeat his federal tax debt. Mitchell is not the "honest but unfortunate debtor" that Congress intended 11 U.S.C. § 727(b)'s fresh start policy of discharge to help. *See Grogan*, 498 U.S. at 286-87, 111 S. Ct. at 659.

## III. Conclusion

The bankruptcy court clearly erred in its finding that Mitchell did not act with the requisite mental state to satisfy the discharge exception of § 523(a)(1)(C). Accordingly, we REVERSE the decision of the district court and hold that Mitchell's tax debts for 1998 to 2002 fall within the scope of the § 523(a)(1)(C) exception, and therefore, such tax debts are not dischargeable in bankruptcy. *See Fretz*, 244 F.3d at 1331 (reversing the district court's holding that the debtor's tax debts were dischargeable under § 523(a)(1)(C) and concluding that the debtor's tax debts were not dischargeable in bankruptcy).

**REVERSED.**