**IN RE: David E. LOOFT, Debtor.**

**David E. Looft, Plaintiff,**

**v.**

**United States of America on Behalf of the Internal Revenue Service, Defendant.**

**CASE NO. 13–60115–BEM**
**ADVERSARY PROCEEDING NO. 13–5249–BEM**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed May 27, 2015

Filed May 28, 2015

---

912

Samuel D. Hicks, Hicks Casey & Foster PC, Marietta, GA, for Debtor.

## *ORDER*

Barbara Ellis–Monro, U.S. Bankruptcy Court Judge

This matter comes before the Court on Debtor–Plaintiff's complaint alleging that federal income tax liabilities he incurred for tax years through and including 2009 totaling more than $319,000 are dischargeable pursuant to 11 U.S.C. §§ 523(a)(1) and 507(a)(8). [Dkt no. 1]. Defendant filed an answer alleging Plaintiff's liabilities for tax years 1993 through 1997 are nondischargeable under § 523(a)(1)(C). [Dkt. no. 5]. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The Court held a trial on March 31, 2015. Having considered the evidence presented and the applicable authorities, the Court

concludes that Plaintiff did not evade paying taxes owed for tax years 1993 through 1997.

### Findings of Fact

For the past 30 years, Plaintiff has worked in technology sales. In early 1996, at a time when Plaintiff was unemployed, he joined FERA Partnership (the "Partnership") and its affiliate, FERA Corporation (the "Corporation" and with the Partnership, "FERA"), which developed corrosion control technology for oil and gas transmission pipelines. Plaintiff became familiar with the Partnership through his then brother-in-law, Tom Wildman, who ran a product development team for FERA. Wildman and FERA's president and managing partner, Mark Rizzo, approached Plaintiff about joining the Partnership. After joining the Partnership as a general partner, Plaintiff learned of the affiliated Corporation, which he also joined as vice president of sales and marketing. Shortly after Plaintiff joined FERA, it lost its largest customer and at least half of its revenue. As a result, FERA had difficulty paying salaries and the partners, including Plaintiff, voluntarily stopped taking salary draws. Plaintiff also stopped receiving compensation from the Corporation and as a result, and in short order, FERA owed Plaintiff almost $70,000 in back pay.

### Events Leading To Assessment

In early 1997, the tax matters partner, Frank Rizzo, approached Plaintiff with a plan to allocate the Partnership's losses in such a way that Plaintiff could collect his back pay. Under the plan, the Partnership would allocate a disproportionate share of its losses to Plaintiff which Plaintiff could then claim on his tax return. As set forth in a memo from Frank Rizzo to Plaintiff dated September 3, 1997, Plaintiff was to be allocated $87,768.25 in Partnership stock losses for 1996 and was allocated an additional $540,000 in Partnership losses. These losses would potentially provide tax refunds that Plaintiff could use to pay the salary he was owed and FERA would receive any excess refunds paid. After discussions and assurance from the tax matters partner and an outside CPA used by FERA, Stavros "Tom" Kikus, Plaintiff agreed to the plan.

Mr. Kikus prepared the 1996 joint tax return for Plaintiff and his then-wife, Kristin Looft (now, Kristen Guyton, hereinafter "Ms. Guyton"), reporting partnership losses of $559,299 and income of -$478,813, which resulted in a refund of $11,301. [Def. ex. 1]. In May 1997, Mr. Kikus prepared an Application for Tentative Refund on behalf of Plaintiff and Ms. Guyton, in which the unused Partnership losses were carried back to 1993, 1994, and 1995, resulting in refunds of $41,690, $20,645, and $21,576 for those tax years, respectively. [Def. ex. 2]. Plaintiff carried forward the remaining losses to 1997 and 1998, which resulted in reduced tax liability (but not a refund) for 1997 and a refund of $14,743 for 1998. [Def. ex. 3, 37, 38]. Thus, the allocation resulted in tax refunds to Plaintiff in the amount of $118,383. Of that amount it appears that $105,786 was due to the Partnership losses. A total of $69,615.14 was to be applied toward Plaintiff's back pay, and $35,570.86 was due to FERA. [Joint ex. 8]. Plaintiff testified that he received a refund check of $106,000, that he kept $69,000 for back pay and partner draws, and that he remitted $37,000 to FERA.

Although Plaintiff testified that he had concerns about the legality of the loss allocation plan when it was first proposed, by the time the plan was implemented his concerns had been fully assuaged and he did not believe he was at any risk from the plan. [Joint Ex. 7]. There is no evidence that the loss allocation plan was improper

or illegal. In addition, there is no evidence that Plaintiff (i) knew or should have known that the underlying losses were suspect, (ii) had any role in determining what losses were claimed by the Partnership, or (iii) knew the losses might be disallowed or otherwise put him at risk.

### FERA Audit and Actions Taken

Plaintiff left FERA in late 1997 or early 1998 after it became clear to him that the company would be unable to recover from its financial difficulties. In 1999, Defendant initiated an audit of the Partnership, and issued a summary report on December 3, 1999. [Def. ex. 39]. According to the report, Defendant determined the net operating losses claimed by the Partnership were not appropriate, which resulted in the Partnership having net income of $231,106.24, of which $75,341 was allocated to Plaintiff. [Def. ex. 39, at 2, 5]. In other words, all the losses claimed by Plaintiff from 1993 to 1998 were disallowed. Plaintiff received a copy of the report in late December 1999 or early 2000. The report also contained alternate findings that the partners had not made any capital contributions and that the Partnership was a sham. Again, there was no evidence presented that Plaintiff was aware of, or responsible for, any possible wrongdoing by the Partnership.

Shortly after Defendant issued the audit report, Plaintiff and three other FERA partners hired a law firm to appeal the results of the audit. The appeal was resolved in Defendant's favor in late 1999 or early 2000. In consultation with their counsel, the partners determined that further appeals to the tax court would be cost prohibitive. Sometime thereafter, Plaintiff, on his own, hired an attorney to sue Frank Rizzo and Tom Kikus. Although Plaintiff believed he had a strong case against the two, he abandoned the potential lawsuit after learning both individuals were likely judgment-proof.

Defendant sent Plaintiff a Notice of Final Partnership Administrative Adjustment on June 24, 2002, which warned Plaintiff his individual tax liability could be affected by the adjustments to the Partnership's tax liability and provided deadlines for challenging the adjustment in federal court. [Def. ex. 40]. In the fourth quarter of 2003, Debtor received notices of assessment.[1] Plaintiff testified that when he received the notice of administrative adjustment to the Partnership income he knew it would have a "big impact" on him, he knew his net operating losses for the years at issue had been disallowed, and he understood the meaning of the assessments. [Trial transcript at 11:15:12].

Taxes and interest in the amount of $217,544.42 were initially assessed by Defendant on November 3, 2003, and November 17, 2003.[2] [Def. ex. 33–38.] In

---

1. Plaintiff testified that he received notices of assessment in late 2003. Plaintiff's petition to abate penalties states that the notices were dated November 10, 2003. [Def. ex. 47]. One notice of assessment for 1996 was included with Defendant's exhibit 40 and is dated November 3, 2003. Thus, it is not exactly clear when the assessment notices were issued, but it is apparent that they were issued and received by Plaintiff in late 2003.

2. According to the letter denying Plaintiff s due process hearing request, dated November 2, 2005, the total unpaid balance of the assessment was $217,520.76. [Def. ex. 58 at p.3]. Defendant's exhibits indicate the following amounts were due as follows: for 1993, taxes of $41,690.00 [Def. ex. 33, 49] and interest of $25,221.37 [Def. ex. 33]; for 1994, taxes of $20,645.00 [Def. ex. 34, 41, 49] and interest of $12,540.56 [Def. ex. 34]; for 1995, taxes of $21,576.00 [Def. ex. 35, 42, 49] and interest of $13,106.09 [Def. ex. 35]; for 1996, taxes of $35,817.00 [Def. ex. 36, 43, 49] and interest of $22,469.09 [Def. ex. 36]; for 1997, taxes of $2,891.00 [Def. ex. 37, 44, 49] and interest of $1,427.49 [Def. ex. 37]; for 1998, taxes of

addition, Defendant assessed accuracy penalties of $29,425.20 for 1993 through 1998. [Def. ex. 41–44; 49],

In January 2004, Plaintiff filed a petition in the United States Tax Court seeking disallowance of the penalties. [Def. ex. 47]. In the petition Plaintiff stated:

I believe that I should not be liable for the penalties that have been assessed to me in the recalculation of my taxes. I relied on the expert advice and service of a CPA who prepared these returns and made repeated assurances that the transaction in question was valid, accurate and would create no future problems for me. The CPA was also the auditor for the company I was employed by, who both convinced me to use my back taxes to provide funds for the company. I took all reasonable care to ensure these returns were accurate and valid which is the primary reason I paid the CPA to prepare them. I do not believe an accuracy related penalty is warranted in my case.

[Def. ex. 47]. On September 16, 2004, the tax court entered a stipulated order abating the accuracy related penalties associated with tax years 1993 to 1998. [Def. ex. 46, 53]. Plaintiff understood that this abatement did not alter the assessments for the taxes or accrued interest.

While the abatement petition was pending, a number of other activities occurred: (i) on February 16, 2004, Defendant issued notices of intent to levy for tax years 1993 to 1998; the total amount due under the notices was $237,001.59 [Def. ex. 48]; (ii) on March 8, 2004, Defendant received Ms. Guyton's request for innocent spouse relief [Joint ex. 1]; (iii) on March 20, 2004, Defendant sent Plaintiff a final notice of intent to levy [Def. ex. 50]; and (iv) on April 8, 2004, on the advice of counsel, Plaintiff

submitted a request for a collection due process hearing with respect to the notice of intent to levy. [Def. ex. 58, p.3.] On April 21, 2004, Defendant sent Plaintiff a letter from its appeal office stating that it had received Plaintiff's case for consideration on February 19, 2004. The letter referenced the 1993 to 1998 income taxes, but it did not specify what aspect of Plaintiff s case was being considered. [Def. ex. 51].

In September 2004, on the advice of counsel, Plaintiff made a voluntary payment of $250 to Defendant, followed by a payment of $2,500 on July 21, 2005. [Joint ex. 4]. Plaintiff testified that the $2,500 payment represented 10 months' worth of payments and that he obtained the money through a home equity line of credit. He further testified that he made the payments to show good faith and to potentially hold off collection activity. In July 2005, Plaintiff and Ms. Guyton were notified that the request for innocent spouse relief had been denied. [Def. ex. 58, p. 4].

In October 2005, Plaintiff paid $4,318.49, the balance due on his 1997 assessment. [Joint ex. 5; Def. ex. 37, 44, 49]. Plaintiff testified that he did so because it was a small balance and he wanted to retire his tax debt for one of the years. Shortly thereafter, on November 2, 2005, Defendant sent Plaintiff a notice of determination of the collection due process proceeding that affirmed the notice of intent to levy, at least in part, because Plaintiff "failed to submit requested financial information...." [Def. ex. 58 p.2]. The delay in resolution of the due process hearing issue was due, in part, to its suspension pending resolution of the claim for innocent spouse relief. [Def. ex. 54].

Around this time, Plaintiff hired Paul Williams, a tax consultant representative,

$17,462.00 [Def. ex. 38, 49] and interest of $2,708.82. [Def. ex. 38].

to work on his behalf in his efforts to revisit and abate the outstanding tax liability. Prior to working as a consultant, Mr. Williams was employed by the Internal Revenue Service and worked as a district director, an assistant regional commissioner for the appeals division, and as a revenue agent. On November 30, 2005, Mr. Williams prepared and submitted to Defendant an offer in compromise for $500 based on doubt as to liability (the "OIC"). [Joint ex. 9]. The OIC included a deposit of $150 and stated that "[b]ecause the Managing Partner was Bankrupt, and the other Partners, including the Taxpayer, did not have the financial means to pursue the case to Court, the taxes were assessed. The Taxpayer feels and believes that because he was a victim of finances at the time, he does not owe the taxes assessed against him personally, and that he was following the instructions of his employer and CPA." *Id.*

Plaintiff testified that his understanding was that the OIC process would provide him an opportunity to have someone on the administrative side of Defendant's agency look at the facts and reach a fair compromise. Even if Defendant rejected the OIC, Plaintiff expected to at least have the opportunity for a fair hearing. Defendant acknowledged receipt of the OIC by letter dated July 26, 2006, and stated that it could process the OIC. [Joint ex. 10]. The letter further stated that Plaintiff "will be contacted by this office within 60 days." *Id.*

Defendant did not contact Plaintiff about the OIC within 60 days. It was not until more than five years later, on December 13, 2011, that Defendant notified Plaintiff that his OIC was closed and returned his deposit. [Joint ex. 11]. Whether the delay was the result of Defendant failing to

timely process the OIC, failing to timely notify Plaintiff of the outcome, or some other reason is unexplained.

In August 2006, prior to learning the outcome of the OIC, Plaintiff and Ms. Guyton divorced. During this period Defendant continued its efforts to collect Plaintiff's tax liability. Plaintiff testified that in September 2006, he received payment reminders from Defendant, which scared him. Defendant also retained Plaintiff's tax refunds for tax years 2008, 2009, and 2010. The account transcript for tax year 1998 contains a credit for retention of a $7,641 refund for tax year 2008 which was retained on April 13, 2009. [Def. ex. 27; Def. ex. 13]. It also contains credits for retention of two refunds for tax year 2009 in the amounts of $9,686 and $7,304, which were retained effective April 15, 2010. [Joint ex. 6]. The account transcript for tax year 1994 contains a credit for retention of a $9,218, refund for tax year 2012 which was retained on April 15, 2011. [Joint ex. 2; Def. ex. 15].

Notwithstanding Defendant's retention of Plaintiff's refunds, Plaintiff did not change his tax withholdings to reduce future refunds. While Plaintiff did experience reduced income after a brief period of unemployment in 2010, Plaintiff otherwise did not alter his withholdings or expenditures to affect the status of future tax refunds.[3]

Plaintiff testified that in 2011 he received a notice of Defendant's intent to levy approximately $22,000 for tax year 1998. Plaintiff testified that he withdrew money from his 401(k), paying tax penalties to do so, and on March 23, 2011, paid Defendant $22,194.05. [Joint ex. 6]. Plaintiff testified that he was hopeful the payment might resolve the dispute with De-

---

**3.** The two refunds in 2009 were caused by Plaintiff's filing an amended return in which

he was due an additional $7,304 refund. [Def. ex. 14, 28; Jt. Ex. 6].

fendant. He was aware that Ms. Guyton settled her issues with Defendant by agreeing to pay off one year of liability; he thought he might receive the same consideration. Ms. Guyton paid $15,000 toward the 1996 tax liability with a payment of $3,000 in 2008 and a payment of $12,000 in 2010. [Joint ex. 4]. Thus, while the OIC was pending, Defendant retained tax refunds and received payments totaling in excess of $71,000.

After sending Plaintiff notice of the denial of the OIC in December 2011, Defendant took no further action until 2013. Plaintiff testified that he believed the reprieve meant Defendant had either placed him in noncollectible status or had ceased collection activity because he had paid off tax year 1998. However, on April 3, 2013, Defendant issued a notice of levy on Plaintiff's bank account. The notice covered tax years 1993 and 1996. The notice identified unpaid assessments of $77,193.90 and statutory additions of $43,805.10 for 1993 and unpaid assessments of $41,699.95 and statutory additions of $33,402.41 for 1996. The total amount due, as set forth in the notice, was $196,101.36. [Def. ex. 63]. After receiving the notice, Plaintiff testified that he attempted to call Defendant a couple of times but hung up after holding for 30 minutes. On April 28, 2013 Defendant levied on Plaintiff's two accounts, including an account he held jointly with his son, and received $15,519.82. [Joint ex. 1]. Plaintiff testified that after the levy he continued the direct deposit of his paychecks into his bank account and did not avoid keeping money in the account. However, shortly after the levy, on May 6, 2013, Debtor filed a Chapter 7 bankruptcy petition; the only significant debts listed in his Schedules were owed to Defendant and his mortgage lenders.

### Plaintiff's Earnings and Lifestyle

At all times after filing his 1996 tax return, Plaintiff earned significant income and lifestyle a very comfortable lifestyle.[4] Ms. Guyton also worked for much of the period between 1997 and the couple's divorce in 2006. From 1999 to 2005, Plaintiff and Ms. Guyton filed joint tax returns. In 2006, Plaintiff began filing tax returns as head of household due to the divorce and because his minor son lived with him. In 2012, Plaintiff changed his filing status to single.

4. The adjusted gross income ("AGI") reported on Plaintiff's tax returns from 1999 to 2012 was as follows:

| Year | Filing Status | AGI | Exhibit |
|------|---------------|-----|---------|
| 1999 | Joint | $278.038 | Def. ex. 18 |
| 2000 | Joint | $241,979 | Def. ex. 19 |
| 2001 | Joint | $198,817 | Def. ex. 20 |
| 2002 | Joint | $256,856 | Def. ex. 21 |
| 2003 | Joint | $288,290 | Def. ex. 22 |
| 2004 | Joint | $302,082 | Def. ex. 23 |
| 2005 | Joint | $324,647 | Def. ex. 24 |
| 2006 | Head of Household | $228,820 | Def. ex. 25 |
| 2007 | Head of Household | $199,499 | Def. ex. 26 |
| 2008 | Head of Household | $197,342 | Def. ex. 27 |
| 2009 | Head of Household | $138,001 | Def. ex. 28 |
| 2010 | Head of Household | $99,206 | Def. ex. 29 |
| 2011 | Head of Household | $154,135 | Def. ex. 30 |
| 2012 | Single | $110,180 | Def. ex. 31 |

Plaintiff's lifestyle was commensurate with his income. He and Ms. Guyton have three children. In 2006, their ages were 16, 21, and 23. In 2004, Debtor purchased a 2000 BMW 323 for $18,500 for his daughter to use while she attended the University of Georgia. When she graduated, he bought her a 1995 BMW for $9,800, and his son, who also attended the University of Georgia, began using the 2000 BMW. Plaintiff's oldest child attended the University of Virginia from 2002 to 2006. Plaintiff paid her tuition, which was about $22,000 per year. Plaintiff also testified that he occasionally gave his children cash gifts, ranging in amount from $500 to $2,000 and to buying them electronics, such as cell phones and, in one instance, a laptop computer.

In addition, during this time period and over the course of a year, Plaintiff and Ms. Guyton invested about $10,000 in Ms. Guyton's business as a legal recruiter. Sometime after the two divorced in 2006, Ms. Guyton liquidated the business. Plaintiff did not recoup any of the original investment which was comprised of earnings from both Plaintiff and Ms. Guyton. When Plaintiff and Ms. Guyton divorced, they sold their home for $550,000. Plaintiff received $137,500 in equity from the sale. Plaintiff used all of these funds as a down payment on the purchase of another house which cost $338,000.

For more than a decade, Plaintiff maintained an expensive golf hobby. From 2003 to 2014, he paid more than $68,000 to his country club. In addition, he spent approximately $3,300 on Las Vegas golfing vacations and $9,000 on other golfing equipment and events. From April 2007 to December 2013, Plaintiff spent more than $13,000 on family vacations and travel, including trips to Cancun, Mexico. However, most of the transportation costs were paid with airline reward points. [Def. ex. 66, 69].

Plaintiff testified that in all tax years other than 1993 to 1998, he prepared his own tax returns, filed the returns on time, and timely paid all tax liabilities in full. *See also*, Def. ex. 20–39. He also testified, repeatedly, that he did not believe he should owe the liabilities at issue, that he was a victim of others' wrongdoing and that, as a result, the assessments were not justified.

### Conclusions of Law

■ Section 727(b) of the Bankruptcy Code provides for the discharge of an individual chapter 7 debtor's prepetition debts unless such debts are excepted from discharge pursuant to 11 U.S.C. § 523. At issue in this case is whether Plaintiff's tax liabilities for 1993 through 1998 are nondischargeable under § 523(a)(1)(C). Section 523(a)(1)(C) excepts from discharge any tax debt "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax[.]" Defendant has not alleged Plaintiff made a fraudulent return. Therefore, the only question is whether Plaintiff willfully attempted to evade or defeat a tax. The burden is on the government to prove nondischargeability by a preponderance of the evidence. *Griffith v. United States (In re Griffith)*, 206 F.3d 1389, 1396 (11th Cir.2000) (*en banc*) (citing *Grogan v. Garner*, 498 U.S. 279, 287–88, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991)).

■ Exceptions to discharge are strictly construed in favor of the debtor, and in the Eleventh Circuit the test for dischargeability under § 523(a)(1)(C) is well established. *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1327 (11th Cir.2011). Defendant must show that Plaintiff "engaged in (1) evasive conduct with (2) a mental state consistent with

willfulness." *Id.* (citations omitted). In determining whether the government has met its burden, the Court considers the totality of the circumstances. *Peterson v. United States (In re Peterson )*, 317 B.R. 556, 562 (Bankr.N.D.Ga.2004) (Diehl, J.).

## A. The Conduct Requirement

■■■ Evasive conduct requires a showing that "the debtor engaged in affirmative acts to avoid payment or collection of the taxes, either through commission or culpable omission." *United States v. Jacobs (In re Jacobs )*, 490 F.3d 913, 921 (11th Cir.2007) (citations and internal quotation marks omitted). The conduct requirement is not satisfied by mere nonpayment of taxes. *Haas v. IRS (In re Haas )*, 48 F.3d 1153, 1158 (1995), abrogated in part by *Griffith*, 206 F.3d at 1395. However, nonpayment may be relevant when considering the totality of the circumstances. *United States v. Fretz (In re Fretz )*, 244 F.3d 1323, 1328 (11th Cir.2001) (citing *United States v. Fegeley (In re Fegeley )*, 118 F.3d 979, 983 (3d Cir.1997)). The Eleventh Circuit has supported a finding of nondischargeability when the conduct included: (1) failure to file tax returns and failure to pay taxes, *Fretz,* 244 F.3d at 1330; *Mitchell,* 633 F.3d at 1327; (2) intra-family transfers for little or no consideration, *Griffith,* 206 F.3d at 1396; (3) titling a house solely in the spouse's name while the debtor remains on the mortgage and makes all the payments, characterizing earnings so they are not subject to tax withholding, and making large discretionary expenditures, *Jacobs,* 490 F.3d at 927; and (4) failure to file tax returns, maintaining a luxury lifestyle, and making substantial intra-family transfers for no consideration, *Zimmerman v. IRS (In re Zimmerman )*, 262 Fed.Appx. 943, 946 (11th Cir.2008).

This case does not fit neatly into the parameters of any of the Eleventh Circuit cases. Like the debtor in *Haas,* Plaintiff's primary offense is a mere nonpayment of taxes. Unlike the debtor in *Haas,* Plaintiff did not use his income to pay off other burdensome debts; he used it to maintain an affluent lifestyle, similar to the debtors in *Mitchell, Jacobs,* and *Zimmerman.* Although lavish spending is relevant to the conduct analysis, it is generally accompanied by additional culpable behavior intended to prevent the IRS from reaching the debtor's assets. *See Peterson,* 317 B.R. at 562–63 (in addition to lavish spending, debtor under-withheld taxes, failed to pay estimated taxes, failed to timely file tax returns, failed to accrue assets and instead leased or rented them); *Barkley v. United States (In re Barkley )*, No. 09–73572, Adv. No. 09–6549, 2010 WL 4642483, at *3–4, 2010 Bankr. LEXIS 3820, at *9 (Bankr.N.D.Ga. Sept. 24, 2010) (Mullins, J.) (in addition to excessive spending, debtor began dealing primarily in cash, discontinued direct deposit of her wages to an account subject to levy by the IRS, and knowingly withheld an insufficient portion of her IRA distributions to pay the taxes due on those distributions); *Hassan v. United States (In re Hassan),* 301 B.R. 614, 620 (S.D.Fla.2003) (in addition to excessive spending, debtors dealt mainly in cash, transferred assets to family members, and failed to accrue assets despite significant earnings); *compare Lynch v. United States (In re Lynch )*, 299 B.R. 62, 76–77, 83 (Bankr.S.D.N.Y.2003) (stating that "allocation of available income to discretionary expenses and debts other than tax liabilities constitutes a willful act to evade the payment of taxes"; in addition to lavish spending, the debtor stopped direct deposit of her paycheck into an account subject to levy by the IRS, but the court regarded that fact as not material).

■ In this case, Plaintiff timely filed all required tax returns and timely paid all amounts due other than the assessments at issue. Plaintiff did not fail to withhold or under-withhold taxes. Indeed, for the years 2008, 2009, and 2010, Plaintiff was entitled to tax refunds in excess of $7,000 per year that were retained by Defendant. Even after the refunds were retained, Plaintiff did not change his withholding to reduce future refunds. Similarly, Plaintiff did not resort to dealing in cash or closing his bank account after the account was levied by Defendant. Plaintiff did not conceal or protect assets from Defendant; he did not title property in the names of others or transfer significant assets to family members for little or no consideration while maintaining the beneficial use of the property, and he made voluntary payments of $29,262.84 to Defendant during the period of September, 2004 through March, 2011. The only steps Plaintiff took to prevent Defendant from collecting the tax liabilities were through official channels: assisting his wife with a request for innocent spouse relief, requesting a collection due process hearing, and making an offer in compromise. The OIC did not fully inhibit Defendant's collection activity, as is shown by Defendant's retention of Plaintiff s tax refunds while the OIC was pending.

Nevertheless, Plaintiff did not moderate his lifestyle after learning of his additional tax liability which resulted from the disallowance of the Partnership's losses. He paid out-of-state college tuition for one child. He purchased two used BMWs for his other children. He and Ms. Guyton invested $10,000 in her business that was never repaid. Over the course of 10 years, Plaintiff spent $68,000 at his country club to support his golfing hobby. In addition, he spent $12,000 at golf retailers and on golfing trips. He also spent generously on electronics for himself and his children and provided some financial support to his children after they became adults.

While Plaintiffs spending in some ways may be characterized as excessive, especially as regards his golfing hobby, it was not entirely unrestrained. He purchased used cars for his children, paid for most of his personal travel with airline points, and downsized his house after divorcing. When considered with the other circumstances—that Plaintiff otherwise paid all his tax debt, filed all returns on time, did not seek to hide assets or avoid collection activities except through official channels and made some voluntary payments—this case is closer to *Haas* than to *Griffith, Jacobs, Zimmerman, ox Mitchell. See United States v. Haas (In re Haas )*, 173 B.R. 753, 756 (S.D.Ala.1992), reversed by *Haas,* 48 F.3d 1153 (in which the district court noted that the debtor in *Haas* "made a tremendous amount of money over the years . . . .").Based on the totality of the circumstances, the Court finds that Plaintiff's conduct was not evasive.

## B. The Mental State Requirement

■ A debtor's conduct results from a willful mental state when it is "done voluntarily, consciously or knowingly, and intentionally." *Mitchell,* 633 F.3d at 1327 (citations and quotation marks omitted). Willfulness can be established by showing the debtor: "(1) had a duty under the law, (2) knew he had a duty, and (3) voluntarily and intentionally violated the duty." *Id.* In most cases, the first two elements of the test are undisputed, leaving the court to consider whether the debtor's failure to pay taxes,was voluntary and intentional or knowing and deliberate. *Id.* at 1328. Although consideration of the badges of fraud may be relevant and helpful in the analysis, the government need not prove fraudulent intent. *Id.* However, it must show something more than inadvertence. *Id.*

Here, it is clear Plaintiff had a duty under the law to pay the taxes assessed for 1993 through 1998 and that he knew of that duty. Plaintiff testified that he knew the disallowance of the Partnership losses was a big issue for him and that he knew the abatement of penalties did not abate the underlying tax and interest. Plaintiff's actions in hiring counsel to challenge the original audit result, requesting a collection due process hearing, and submitting an OIC indicate that he understood he had a duty to pay the assessments at issue unless they were abated. The closer question is whether Plaintiff voluntarily and intentionally violated that duty.

In November 2003, when Plaintiff first received the new assessments for 1993 through 1998, the total liabilities were approximately $217,544.42. Between September 2004 and October 2005, Plaintiff made voluntary payments totaling $7,068.49. Between April 2009 and April 2011, Defendant retained tax refunds totaling $33,849 and received a voluntary payment from Plaintiff of $22,194.05. In April 2013, Defendant received $15,519.82 from the levy of Plaintiff s bank accounts. In addition, Ms. Guyton made payments to Defendant totaling $15,000. Thus, Plaintiff and Ms. Guyton have paid Defendant more than $93,000 or 43% of the amount of the November 2003 assessments. Such payments, either made voluntarily or through seizing assets readily available to Defendant, are not consistent with an intentional failure to pay.

Furthermore, although Plaintiff did not pursue further appeals of the Partnership audit after it was initially upheld, he continually questioned his responsibility for the liabilities. Plaintiff presented those concerns to Defendant in writing in his petition to abate penalties and his OIC. He also sought discussions with Defendant through the collection due process hearing. Plaintiff testified he did not believe he was responsible for the taxes because he was misled by Frank Rizzo and Mr. Kikus. Aside from the years at issue, Plaintiff otherwise paid his taxes. It is only in the situation where he agreed at the behest of Mr. Rizzo and Mr. Kikus to obtain the refunds that Plaintiff failed to pay the taxes assessed. To the extent Plaintiff turned over a portion of the refund to FERA, the Court cannot say that Plaintiff's position is unreasonable. The Court concludes that, at least to the extent of the $37,000 paid to FERA, Plaintiff's failure to pay did not amount to a voluntary and intentional violation of Plaintiff s duty to pay the taxes at issue.

### Conclusion

To establish the nondischargeability of the tax liabilities at issue, Defendant must prove evasive conduct and a willful mental state. As to the conduct element, Defendant showed that Plaintiff failed to pay taxes while maintaining an affluent lifestyle. When considered in the context of the totality of the circumstances, these facts are insufficient to establish evasion. As a result, Defendant has failed to prove an element necessary to its claim. As to a willful mental state, Plaintiff was aware of the tax liability and of his duty to pay it. However, his failure to pay the taxes in full was based on a reasonable, if mistaken, belief by Plaintiff that he was improperly being held liable for the misconduct of others. To the extent the loss allocation plan enriched FERA rather than Plaintiff, Defendant has failed to prove the second element of its claim. Accordingly, Plaintiff's tax liabilities for 1993 to 1998 are dischargeable. The Court will enter a separate judgment in favor of Plaintiff.